******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE ELIJAH G.-R.*

(AC 38623)

Beach, Prescott and Bishop, Js.

*Argued May 16—officially released July 7, 2016***

(Appeal from Superior Court, judicial district of New London, Child Protection Session at Waterford, Driscoll, J.)

*Jeffery R. Berry*, for the appellant (respondent mother).

*Daniel M. Salton*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Don M. Hodgdon*, for the minor child.

*Opinion*

PRESCOTT, J. The respondent, Deborah G., appeals from the judgment of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights with respect to her son, Elijah G.-R.[1] On appeal, the respondent claims that the court improperly (1) failed to conduct a pretrial canvass of her in accordance with our Supreme Court's decision in *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015); (2) determined, in accordance with General Statutes § 17a-112 (j) (1), that the petitioner had proven by clear and convincing evidence that the Department of Children and Families (department) had made reasonable efforts to reunify her with Elijah; and (3) determined, in accordance with § 17a-112 (j) (2) and (k), that the petitioner had proven by clear and convincing evidence that termination of her parental rights was in the best interest of Elijah. We affirm the judgment of the trial court.

The record reveals the following relevant facts, as set forth by the trial court in its oral memorandum of decision, and procedural history. "When Elijah was born, [the respondent] was residing in a drug treatment facility for mothers and children. [The respondent] had entered the facility shortly before Elijah was born, asserting that she had used crack cocaine during her pregnancy. [After Elijah was born, the petitioner] learned that [the respondent] had left the facility without permission and [had] used crack cocaine, thus subjecting herself and Elijah to discharge.

"The [petitioner] imposed a [ninety-six] hour administrative hold on Elijah [who was approximately one month old] on January 22, 2013. On January 23, 2013, an [ex parte] order of temporary custody was sought by the [petitioner] and a neglect petition was filed. The order of temporary custody was granted by Judge Mack.[2]

"On February 1, 2013, [the respondent] appeared, was appointed counsel, and filed a written plea of nolo contendere, which was accepted, and Elijah was adjudicated neglected and committed to [the petitioner] . . . ." (Footnote added.)

"[The respondent was issued court-ordered specific steps for reunification, which] included in significant part that she cooperate and make progress in individual and parenting counseling, that she cooperate with substance abuse treatment, that she not use illegal drugs, that she obtain an adequate home and income, that she immediately advise [the department] of the status of her household especially with regard to the child's safety, and that she visit Elijah as often as permitted."

On October 22, 2014, the petitioner filed a petition to terminate the parental rights of Elijah's father and the respondent. With respect to the respondent, the

petition sought termination on the ground that Elijah had been adjudicated neglected or uncared for, and the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in his life. See General Statutes (Supp. 2016) § 17a-112 (j) (3) (B) (i).[3]

A trial was conducted on the petition over the span of five days between May 28, and June 29, 2015. Both the petitioner and the respondent presented exhibits and called witnesses. The respondent testified on her own behalf.[4] In total, thirty exhibits were presented, and nine witnesses were called.

The court issued an oral decision on October 27, 2015, granting the petition to terminate the parental rights of the respondent and Elijah's father. With respect to the respondent, the court found that the petitioner had proven by clear and convincing evidence the ground for termination asserted in the petition. The court also found, pursuant to § 17a-112 (j) (1), that the department had made reasonable efforts to reunify Elijah with the respondent and that the respondent was unable or unwilling to benefit from reunification efforts.

Having found that the ground for termination had been proven, the court considered the appropriate disposition of the child and made written findings regarding the best interest of the child pursuant to the criteria set forth in § 17a-112 (k). On the basis of these findings, the court determined by clear and convincing evidence that termination of the parental rights of the respondent and the father was in the best interest of Elijah. Accordingly, the court terminated the parental rights of both parents, and appointed the petitioner as Elijah's statutory parent for the purpose of securing his adoption by his foster parents. This appeal followed.[5] Additional facts will be set forth as necessary.

I

The respondent first claims that the court improperly failed to conduct a pretrial canvass of her in accordance with our Supreme Court's decision in *In re Yasiel R.*, supra, 317 Conn. 773. Specifically, she alleges that the supervisory rule announced in *In re Yasiel R.* required the court to canvass her prior to the start of trial and that the timing of the court's canvass after the trial had ended, but before the court issued its decision, automatically requires the judgment terminating her parental rights to be reversed and a new trial ordered. The petitioner responds that the supervisory rule announced *In re Yasiel R.* should not be applied retroactively, and, even if it is retroactive, any error in conducting the canvass is subject to harmless error analysis, and no harm occurred as a result of the untimely canvass in

this case. We agree in part with the petitioner. Specifically, we conclude that the respondent has failed to establish that she was harmed by the *In re Yasiel R.* canvass being conducted after the close of evidence but prior to the court rendering its decision, and, thus, she is not entitled to a new trial.

The following additional facts and procedural history are necessary for our review of this claim. After trial, but prior to the trial court rendering its decision, our Supreme Court decided *In re Yasiel R.*, supra, 317 Conn. 773. In *In re Yasiel R.*, which was released on August 18, 2015, less than two months after the completion of the respondent's trial, our Supreme Court held that, pursuant to the court's supervisory powers over the administration of justice, "public confidence in the integrity of the judicial system would be enhanced by a rule requiring a brief canvass of all parents *immediately before a parental rights termination trial* so as to ensure that the parents understand the trial process, their rights during the trial and the potential consequences." (Emphasis added.) Id., 794.

In an attempt to comply with this new rule, the court requested the parties to return to court on August 31, 2015. The court informed the parties, including the respondent and her trial attorney, Ryan Ziolkowski, of our Supreme Court's recent holding in *In re Yasiel R.* and canvassed her as follows: "[O]ur Supreme Court recently issued a decision in the case of *In re Yasiel R.* The decision came out approximately two weeks ago, and in it, [the court] indicated that there was an advisement [it wishes] the trial court to provide prior to the commencement of all termination cases, and they applied it retroactively in the case of *In re Yasiel R.*

"So, despite the fact that this case had concluded in terms of evidence, I have ordered it brought back in for the purpose of giving [the respondent] the following advisement.

"There is pending a termination of parental rights petition, and you should be aware that if granted, it would result in the end of your legal relationship with Elijah. You would have no legal rights, no authority, and no responsibility for Elijah. You would no longer have any right to make any decisions of any kind affecting your son.

"You would not be entitled to any state or federal benefits or entitlements that are based upon you being Elijah's mother. Elijah would be eligible to be adopted. You would not be able to obtain Elijah's birth certificate.

"Unless and until the termination petition is granted, you remain Elijah's legal mother, responsible for his financial support and entitled to all of those benefits I just described.

"Now, you have an attorney and your attorney would

always assist you with any defenses you may have had to the [petitioner's] allegations. As you are or should be aware, you did not have to prove anything at trial. That [the petitioner] has the burden of proving [the] case by clear and convincing evidence. And during that trial, you had legal rights, including the right to confront witnesses and to have your lawyer cross-examine those witnesses to determine the credibility of their testimony. You had a right to object to the admission of any documents or exhibits including social studies or psychological reports. You had the right to bring in your own witnesses and you did produce witnesses to assist you in challenging the allegations. You had the right to testify, and that is to tell your side of the story, present your case if you wanted to. You did not have to. You chose to.

"Now, I'm going to advise you as to an adverse inference even . . . though it's moot in this case, meaning it would not happen.

"If you had not testified, the court could have drawn an adverse inference against you; that is the court could decide you did not testify because you felt your testimony would not be helpful to you or would be harmful to you. That would require notice to be [given to] you in advance that the court was considering or being asked to take an adverse inference and give you an opportunity to testify. As I said, it's a nonissue, but I have to advise you of it. It's a nonissue in this case because the [petitioner] didn't ask for an adverse inference and you did in fact testify.

"So that—and as I told you, the entire burden of proof in the case was on the [petitioner].

"Now, have you understood your rights and your responsibilities as to the termination petition?

"[The Respondent]: I believe I have.

"The Court: Okay.

"[The Respondent]: It's—there are things that I'm not sure about because I'm not in the court as often as some of you all are—

"The Court: Okay.

"[The Respondent]: —but—go ahead.

"The Court: What—of what I just told you, was there anything—

"[The Respondent]: Uh-huh.

"The Court: —that you wish clarified or repeated?

"[The Respondent]: Not at this time, Your Honor.

"The Court: Okay. And you understood what I said?

"[The Respondent]: Yes, sir.

"The Court: Okay. Have you had enough time to talk

to [your attorney]?

"[The Respondent]: I—I don't believe so. I had a very brief meeting with him.

"The Court: Okay. Well, if you don't mind waiting, then we'll give you time to talk to him."

The court took a brief recess, during which the respondent spoke with Ziolkowski. After the recess, the parties again appeared in front of the court. The following colloquy occurred:

"The Court: So . . . had I given you [the *In re Yasiel R.*] advisement immediately prior to the start of trial—

"[The Respondent]: Uh-huh.

"The Court: —is there something that [you and your attorney] . . . would have done differently prior to June 29 [the start of trial]? Have you talked to your lawyer about that?

"[The Respondent]: Yes, sir.

"The Court: Okay, [Attorney Ziolkowski] was there any evidence that wasn't presented because [the respondent] didn't understand her rights, or was there anything that she is thinking could have or should have been done differently?

"[Attorney Ziolkowski]: I personally don't believe so. We went forward to trial in a manner which I felt appropriate. There were certain witnesses we had. There were certain witnesses we didn't have based upon my opinion as to whether or not they would be helpful or had relevant information to the case.

"She has several witnesses whom I would consider to be more character witnesses rather than professional service providers that she feels should have been or could be called as a result of her advisement this morning.

"The Court: What about the advisement this morning? Would it have made those witnesses relevant? What was it that [the respondent] did not know that she's learned today that would call for reopening the evidence to allow somebody to come in?

"[Attorney Ziolkowski]: I can't speak to that, Your Honor. I don't—I don't know.

"[The Respondent]: This is someone you personally know that could speak on my behalf. . . .

"The Court: I mean, it wasn't like you were sitting there and all of a sudden a light bulb went on [during the advisement] and you said, oh, my goodness, I just— I've just learned that I'm not—if my parental rights are terminated, I can't get my child's birth certificate as a result of which—now that changes something. I have somebody I wanted to testify. . . . [I]s there anything in that advisement that you were unaware of prior to

the trial commencing?

"[The Respondent]: There was . . . . . I wasn't always able to—to get ahold of [my attorney].

"The Court: Okay. But that's—was there anything in today's advisement—

"The Respondent: No.

"The Court: —that changed your mind?

"[The Respondent]: No, Your Honor."

The respondent did not object to the timeliness of the *In re Yasiel R.* canvass. She also did not request a new trial or that evidence be reopened for the purpose of entering additional evidence.

As this court recently summarized, "[o]ur Supreme Court exercised its supervisory powers in *In re Yasiel R.* to announce a new rule that, although not constitutionally required, it concluded was necessary to protect the perceived fairness of the judicial system with regard to termination of parental rights proceedings. In setting forth the parameters of its newly crafted canvass requirement, our Supreme Court stated: '[B]y exercising our supervisory authority in the present case, we are promoting public confidence in the process by ensuring that all parents involved in parental termination proceedings fully understand their right to participate and the consequences of the proceeding. We conclude, therefore, that it is proper to exercise our supervisory power in the present case and require that, in all termination proceedings, the trial court must canvass the respondent *prior to the start of the trial*. The canvass need not be lengthy as long as the court is convinced that the respondent fully understands his or her rights. In the canvass, the respondent should be advised of: (1) the nature of the termination of parental rights proceeding and the legal effect thereof if a judgment is entered terminating parental rights; (2) the respondent's right to defend against the accusations; (3) the respondent's right to confront and cross-examine witnesses; (4) the respondent's right to object to the admission of exhibits; (5) the respondent's right to present evidence opposing the allegations; (6) the respondent's right to representation by counsel; (7) the respondent's right to testify on his or her own behalf; and (8) if the respondent does not intend to testify, he or she should also be advised that if requested by the petitioner, or the court is so inclined, the court may take an adverse inference from his or her failure to testify, and explain the significance of that inference. Finally, the respondent should be advised that if he or she does not present any witnesses on his or her behalf, object to exhibits, or cross-examine witnesses, the court will decide the matter based upon the evidence presented during trial. The court should then inquire whether the respondent understands his or her rights and whether there are any questions. This canvass will ensure that the respon-

dent is fully aware of his or her rights at the commencement of the trial. It will neither materially delay the termination proceeding nor unduly burden the state.' . . . *In re Yasiel R.*, supra, 317 Conn. 794–95. The court stressed that the canvass was required in all parental termination cases, not just in those cases in which the respondent's attorney chooses not to contest evidence, as was the case in *In re Yasiel R.*" (Emphasis in original.) *In re Leilah W.*, 166 Conn. App. 48, 60–62,     A.3d     (2016).

Subsequent to the decision in *In re Yasiel R.*, this court decided *In re Daniel N.*, 163 Conn. App. 322, 333–37,     A.3d     (2016), *petition for cert. filed* (Conn. March 1, 2016) (No. 150299). In *In re Daniel N.*, the respondent's parental rights were terminated by the trial court, but he was never canvassed in accordance with the supervisory rule announced in *In re Yasiel R.* On appeal to this court, the respondent claimed that he was entitled to a new trial because the supervisory rule announced in *In re Yasiel R.* must be applied retroactively. Id., 333. We agreed with the respondent that the holding in *In re Yasiel R.* applied retroactively,[6] and ordered a new trial on the petition for termination of parental rights. Id., 336–37. This court held that a new trial in a termination proceeding was required if the parent never received a canvass regarding his or her rights. Id.

Recently, this court distinguished between cases in which the *In re Yasiel R.* canvass never was given and cases in which the canvass was given after the close of evidence, but prior to the court rendering a decision in the matter. See *In re Leilah W.*, supra, 166 Conn. App. 64. Although our Supreme Court's decision in *In re Yasiel R.* had been released approximately two months prior to the start of trial, the trial court in *In re Leilah W.* did not conduct the *In re Yasiel R.* canvass before beginning the trial. Id. After the close of evidence, the assistant attorney general representing the petitioner informed the court of this oversight. Id., 53. To remedy this oversight, the court requested the parties to return to court so that it could conduct the canvass. Id. After the canvass, the petitioner informed the court that he had no questions, and he did not object to the untimeliness of the canvass, or request a new trial or for evidence to be reopened. Id., 55. Approximately three weeks after the court conducted the *In re Yasiel R.* canvass, it issued its written memorandum of decision, granting the petition to terminate the respondent's parental rights. Id.

On appeal to this court, the respondent in *In re Leilah W.* contended that the court's failure to conduct the *In re Yasiel R.* canvass prior to the start of trial automatically required a new trial. We did not agree: "[W]e are unconvinced under the facts of the present case that the trial court's failure strictly to comply with the Supreme

Court's supervisory rule by canvassing the respondent after the close of evidence at the termination trial ended requires reversal of the judgment of termination and a new trial. We agree with the petitioner that . . . a trial court's failure to comply with a supervisory rule does not automatically require reversal and a new trial in all cases." Id., 62. We held that if the trial court fails to comply fully with the supervisory rule by not conducting the canvass before trial, but does conduct a later canvass before deciding the case, a new trial is not required if the respondent fails to establish that such noncompliance caused actual harm. Id., 62–64.

In analyzing the respondent's claim in *In re Leilah W.*, we emphasized that "[i]n canvassing the respondent after the close of evidence, the court fully advised the respondent of his rights as a parent in a termination proceeding, including potential consequences. The respondent acknowledged that he had been informed of these same rights prior to trial by his attorney. The court gave the respondent an opportunity to consult with his attorney after the canvass, and the respondent indicated that he had no questions. There was no request for any additional consultation time or a continuance. At no time did the respondent or his counsel voice any objection to the trial court regarding the timing of the canvass or its content. The respondent did not move for a mistrial, and never asked the court to reopen the evidence so that he could present any additional witnesses, raise challenges to the petitioner's exhibits or recall witnesses for cross-examination. Although the respondent argues on appeal that it was useless for the court to provide a canvass after the evidence was admitted and the witnesses questioned, he fails to explain how he would have proceeded differently had the court properly canvassed him prior to the start of trial." (Footnote omitted.) Id., 64–65.

On the basis of these facts, we determined in *In re Leilah W.* that the respondent had failed to demonstrate that he was harmed by the trial court's failure to canvass him prior to the start of trial. Id., 66. Accordingly, we concluded that although the trial court did not conduct the *In re Yasiel R.* canvass prior to the start of trial, the respondent was not entitled to a new trial under the circumstances of the case. Id., 65.

The facts of the present case are almost identical to those in *In re Leilah W.* In canvassing the respondent after the close of evidence, the court fully advised the respondent of her rights and the potential consequences of a termination of parental rights proceeding. Additionally, the court gave the respondent an opportunity to consult with her attorney after the canvass. There was no request for any additional consultation time or a continuance. The respondent did not voice any objection to the trial court regarding the timing of the canvass or its content. The respondent did not move for a mis-

trial, nor did she ask the court to reopen the evidence. Rather, her attorney specifically stated that even if the respondent had been canvassed prior to the start of trial, he would have done nothing differently during trial.

There are two main differences between *In re Leilah W.* and the present case. First, in the present case, unlike in *In re Leilah W.*, our Supreme Court's decision in *In re Yasiel R.* was not released until after the close of evidence. Thus, the trial court did not commit error by forgetting to conduct the *In re Yasiel R.* canvass. Rather, once the supervisory rule was announced, the court did everything in its power to comply with it, canvassing the respondent approximately two weeks later. The court's actions did not "[threaten] the integrity of the trial"; (internal quotation marks omitted) id., 64; but, rather, sought to effectuate the purpose underlying the supervisory rule—"promoting public confidence in the process by ensuring that all parents involved in parental termination proceedings fully understand their right to participate and the consequences of the proceeding." *In re Yasiel R.*, supra, 317 Conn. 794–95.

Second, in the present case, there was a prolonged colloquy between the court and the respondent following the *In re Yasiel R.* canvass. In *In re Leilah W.*, the respondent merely stated that he had no questions in response to the canvass. *In re Leilah W.*, supra, 166 App. Conn. 55. In her brief on appeal, the respondent in this case does not take fault with the substance of the canvass, nor does she contend that she did not understand the canvass. In her reply brief, however, she contends that the colloquy that occurred between herself, the court, and Ziolkowski after the canvass shows that she did not understand it.

Contrary to the respondent's contention, this colloquy shows that the court made every effort to explain the purpose of the canvass to her, including her right to participate and the consequences of the proceeding. The respondent may have been confused as to the purpose of the canvass at first. The court, however, explained that the purpose of the canvass was not to question her attorney's strategic decision to call or not call certain witnesses, or to complain that her attorney did not contact her enough. The purpose of the *In re Yasiel R.* canvass in this case was to ascertain whether, upon being canvassed, the respondent would have conducted the trial differently because, prior to being canvassed, she did not know her rights or the consequences of the proceedings. After the court gave this explanation, the respondent stated that she now understood.

Even if the respondent remained confused about the purpose of the *In re Yasiel R.* canvass, she has failed to explain on appeal how she was harmed by the timing of the canvass. She does not allege that if she had

understood the canvass, she would have requested a new trial or the evidence reopened, nor has she explained what additional evidence she would have presented that would have made a difference in the outcome of the trial. She also does not allege that if the court had conducted the canvass prior to the start of trial, she would not have testified. Indeed, the court did canvass her, at least partially, on this topic before she testified. Rather, the respondent argues only that the timing of the *In re Yasiel R.* canvass after the end of trial, but prior to the court deciding the case, amounts to structural error, and, thus, if the canvass is not conducted prior to the start of trial, a new trial always is required. This contention, however, expressly was rejected by this court in *In re Leilah W.*

On the basis of our review of the trial court's *In re Yasiel R.* canvass and the ensuing colloquy between the court and the respondent, we conclude that the court reasonably could have concluded that the respondent fully understood the trial process, the rights she had during the trial, and the potential consequences of the termination of her parental rights. Additionally, the respondent has failed to establish that she was harmed by the timing of the canvass. Accordingly, we reject the respondent's claim.

## II

The respondent's remaining claims challenge the merits of the court's judgment terminating her parental rights. Specifically, she claims that the court improperly determined, in the adjudicatory phase, that the department had made reasonable efforts to reunify her with Elijah and, in the dispositional phase, that termination of her parental rights was in Elijah's best interest. We are not persuaded by either of the respondent's claims.

Prior to reviewing each of the respondent's claims, we set forth the well established legal framework for deciding termination of parental rights petitions. "[A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 487, 940 A.2d 733 (2008).

## A

Concerning the adjudicatory phase of the proceedings, the respondent claims that the court improperly

found, pursuant to § 17a-112 (j) (1),[7] that the department had made reasonable efforts to reunify Elijah with her. Specifically, she contends that if the department had provided her with a different visitation environment, Elijah's distress and anxiety during their visits would have been lessened and, thus, her relationship with Elijah would have improved. Because the respondent on appeal inadequately has challenged the court's alternative finding that she was unable or unwilling to benefit from the department's reunification efforts, there is no practical relief that we can afford her, and, thus, this claim is moot.

"Mootness raises the issue of a court's subject matter jurisdiction and is therefore appropriately considered even when not raised by one of the parties. . . . Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [a] court's subject matter jurisdiction . . . . We begin with the four part test for justiciability established in *State* v. *Nardini*, 187 Conn. 109, 445 A.2d 304 (1982). . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . [I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *In re Jorden R.*, 293 Conn. 539, 555–56, 979 A.2d 469 (2009).

Our Supreme Court's decision in *In re Jorden R.* controls our determination of this claim. The court in *In re Jorden R.* clarified that "[a]s part of a termination of parental rights proceeding, § 17a-112 (j) (1) requires the department to prove by clear and convincing evidence that it has made reasonable efforts to locate the parent and to reunify the child with the parent, *unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts* . . . .

"Because the two clauses are separated by the word unless, this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or, alternatively,* that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both

circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original; internal quotation marks omitted.) Id., 552–53. According to the court, to hold otherwise "would be contrary to the clear and unambiguous statutory language permitting the trial court to excuse such efforts [if] a parent is unwilling or unable to benefit from them." Id., 554. Thus, the two findings are not dependent upon each other, and the department is not required to prove that it made reasonable efforts to reunify the family in order to prove that the respondent is unable or unwilling to benefit from such efforts.

Accordingly, the court in *In re Jorden R.* held that in cases in which the trial court finds both that the department made reasonable efforts to reunify the family *and* that the respondent was unable or unwilling to benefit from such efforts, on appeal, both findings must be challenged successfully. See id. If only one finding is challenged, the claim is moot, because there is an alternative finding upon which to uphold the termination of parental rights, and, thus, no practical relief could flow from our review. Id., 555.

Relying on the decision in *In re Jorden R.*, this court recently concluded that a claim challenging the trial court's finding that the department made reasonable efforts to reunify the family was moot because the respondent did not challenge the court's alternative finding that she was unable or unwilling to benefits from such efforts. *In re Elijah C.*, 164 Conn. App. 518, A.3d , cert. granted, 321 Conn. 917, A.3d (2016). In *In re Elijah C.*, the trial court terminated the respondent's parental rights after concluding that the department had made reasonable efforts to reunify the family and that the respondent was unable or unwilling to benefit from such efforts. Id., 521.

On appeal to this court, the respondent in *In re Elijah C.* challenged the trial court's finding that the department had made reasonable efforts to reunify her with her son. Id., 525. The respondent's appellate brief in that case, however, contained only seven sentences challenging the court's finding that she was unable or unwilling to benefit from the department's reunification efforts, and it lacked any legal authority or analysis. Id., 529. This court held that the respondent's challenge to the court's finding that she was unable or unwilling to benefit from the department's efforts was inadequately briefed. Id.; see also *In re Kachainy C.*, 67 Conn. App. 401, 413, 787 A.2d 592 (2001) ("We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . We will not review claims absent law and analysis." [Internal quotation marks omitted.]). Accordingly, we concluded in *In re Elijah C.*, supra,

164 Conn. App. 529: "[O]n the basis of the controlling precedent from our Supreme Court, that the respondent's appeal from the court's judgment terminating her parental rights is moot because she failed to challenge the court's finding that she was unable to benefit from the reunification efforts."

In the present case, the trial court found both that the department had made reasonable efforts to reunify the family *and* that the respondent was unable or unwilling to benefit from reunification efforts. On appeal, the respondent challenges the court's finding that she was unable or unwilling to benefit from the department's reunification efforts in two sentences in her appellate brief: "[The] respondent challenges the finding that [the department] made reasonable efforts to reunify her with her children. The other adjudicatory findings are *dependent* on this finding. *In the absence of reasonable reunification efforts*, [*the*] *respondent cannot have been unable or unwilling to benefit from 'these efforts.'* " (Emphasis added.) The respondent does not offer any legal support or analysis for her contention that the court's finding that she was unable or unwilling to benefit from the department's reunification efforts is dependent on the court's finding that the department made reasonable efforts to reunify her with Elijah. Indeed, the respondent's contention is contravened by our Supreme Court's reasoning in *In re Jorden R.*, that these grounds are not dependent on each other.

The respondent, in her brief, relies on mere abstract assertion in challenging the court's finding that she was unable or unwilling to benefit from the department's reunification efforts. As in *In re Elijah C.*, the respondent here has briefed inadequately any challenge to the court's finding that she was unable or unwilling to benefit from reunification efforts. Therefore, we conclude that the respondent's claim is moot.

B

Concerning the dispositional phase of the proceedings, the respondent claims that the court improperly determined, pursuant to § 17a-112 (j) (2),[8] that termination of her parental rights was in the best interest of Elijah. Specifically, she contends that the court improperly weighed the factors listed in § 17a-112 (k)[9] in determining whether termination of the respondent's parental rights was in Elijah's best interest. In particular, she sets forth three arguments. First, she argues that the department did not make reasonable efforts to reunify her with Elijah. Specifically, she alleges that although she agrees with the court's finding that visits with her caused Elijah distress, his distress was not caused by her but by the environment of the visitation room at the department's facility in which visits took place, and, thus, the department should have provided an alternative environment for their visits. Second, she argues that the court placed too much weight on the

wishes of Elijah, who was two years old at the time of trial. Third, she argues that the court's finding that she had not been prevented from maintaining a meaningful relationship with Elijah was clearly erroneous because Elijah's foster family did not prepare him for visits with her, and they did not have recent photographs of her in their home. We are not persuaded.

Prior to setting forth the facts underlying the respondent's claim, we emphasize that "[a]lthough [§ 17a-112 (k)] mandated that the trial court make written findings . . . § 17a-112 contain[s] nothing to indicate that any such finding was a prerequisite to the termination of parental rights. Thus . . . the factors to be considered under [that statute serve] only to guide the trial court in making its ultimate decision whether to grant the termination petition. . . .

"[T]he fact that the legislature [had interpolated] objective guidelines into the open-ended fact-oriented statutes which govern [parental termination] disputes . . . should not be construed as a predetermined weighing of evidence . . . by the legislature. [If] . . . the record reveals that the trial court's ultimate conclusions [regarding termination of parental rights] are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . .

"Indeed . . . [t]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . [A]lthough a trial court shall consider and make written findings regarding the factors enumerated in § 17a-112 (k), a trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." (Citations omitted; internal quotation marks omitted.) *In re Nevaeh W.*, 317 Conn. 723, 739–40, 120 A.3d 1177 (2015).

The following additional facts are relevant to our review of the respondent's claim. In its oral memorandum of decision addressing the dispositional phase, the court stated that it "[had] considered the seven statutory factors [pursuant to § 17a-112 (k)] and made its finding in writing on the Judicial Branch approved form." On the Judicial Branch approved form, the court found that (1) "[the respondent was] offered timely services, including visitation, substance abuse evaluation, and treatment"; (2) "[r]easonable efforts were made by [the department]"; (3) "[s]pecific steps were issued by the [c]ourt [to the respondent] . . . [and the] degree of compliance by [the respondent] is reviewed in the adjudicatory discussion";[10] (4) "[Elijah] knows [the respondent] and has demonstrated affection

toward her, but most visits with [the respondent] are a cause of anxiety and distress for Elijah [and he] is closely bonded to his relative foster parents"; (5) "Elijah [at the time of trial was] two years old"; (6) "[the respondent] has visited with Elijah faithfully, without improving their relationship [and the respondent] has not addressed her mental health needs in a consistent, productive manner"; (7) "[n]o . . . prevention [to the respondent's maintenance of a meaningful relationship with Elijah] was made."

Although the court did not make any subordinate factual findings regarding what reasonable efforts the department made, on the basis of our review of the record, the court reasonably could have found that the department provided the respondent with referrals to outpatient mental health services, case management, supervised visitation, integrative parenting services, outpatient substance abuse evaluation and random drug testing, referrals and information regarding rent subsidies and public housing programs, and transportation assistance. Additionally, as part of supervised visitation, the department provided the respondent with the opportunity to take Elijah to get a haircut, to play with him at the park, and to attend his doctor's appointments.

Visitations at the park ceased after Elijah fell from a piece of playground equipment. Additionally, the department was unwilling to allow at-home visitations. According to Heidi Reinan, a permanency social worker for the department, the department's decision not to allow at-home visitations was influenced heavily by the respondent's continued relationship with Elijah's father. Although the respondent's court-ordered specific steps did not require her to end all contact with Elijah's father, the department and the court had told the respondent on several occasions to end completely all contact with the father because of the threat he posed to her sobriety. The respondent, however, lied to the department regarding whether Elijah's father lived at the respondent's residence for a period of time and that she remained in contact with him. Thus, the department was unwilling to bring Elijah to the respondent's residence on the ground that it could not trust the respondent to keep the father away from both herself and Elijah.

In addition to the services provided by the department, the respondent was afforded weekly telephone calls to the foster family's home so that she could speak with Elijah. A journal also was utilized to convey information between the foster family and the respondent concerning Elijah. The foster family even permitted the respondent to attend Christmas at the foster family's home with Elijah. The foster family, however, did not prepare Elijah in advance for his visits with the respondent to avoid him becoming anxious about the visits,

and they did not have any recent photographs of the respondent in their home.

After stating that it had considered the seven factors listed in § 17a-112 (k), the court's oral memorandum of decision further found, in determining Elijah's best interest, that "Elijah has been becoming increasingly distressed by his exposure to [the respondent]. He is in . . . foster care [with relatives]. He is stable there. He is doing well. They are willing to adopt, and Elijah has been placed with them for almost his entire life. He considers his foster mother and his foster father as his psychological parents. He calls his foster mother auntie. He calls his foster father dad. And in terms that have been explained explicitly to [the respondent] to be inappropriate, [she] corrects him every time and says he is not your father, he is your uncle, just causing distress to the child.

"When the child is visiting with [the respondent], he is routinely asking to return to his foster parents. He looks to them for comfort, for solace. He finds permanency in their home. He finds stability in their home. He is thriving in their home. He does not want to have anything to do with [the respondent]. His best interest as advocated for by his attorney and [guardian ad litem] are termination of parental rights and adoption.

"The court [thus found] by clear and convincing evidence that the department [had] established [termination of parental rights] to be in Elijah's best interest. Therefore, given the totality of the circumstances and the finding of the court as to the adjudicatory issues and the best interest of Elijah, the court [ordered] that the parental rights of [the respondent] to [her] son Elijah G.R. . . . are hereby terminated."

Before addressing the respondent's arguments regarding the court's best interest of the child determination, we begin with our standard of review and guiding legal principles. "During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence. . . .

"It is axiomatic that a trial court's factual findings are accorded great deference. Accordingly, an appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous.[11] . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citations omitted; footnotes altered; internal quotation marks omitted.) *In re Davonta V.*, supra, 285 Conn. 487–88. "[E]very reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) Id., 488. Additionally, in

reviewing the court's findings under the dispositional phase of the proceedings, it is appropriate to read the trial court's opinion as a whole, including its findings in the adjudicatory phase. *In re Nevaeh W.*, supra, 317 Conn. 733–34.

In deciding whether termination of parental rights is in the best interest of the child, the court shall consider and make written findings concerning the seven factors listed in § 17a-112 (k), although these factors "serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered . . . . We have held . . . that the petitioner is not required to prove each of the seven factors by clear and convincing evidence." (Emphasis omitted; internal quotation marks omitted.) *In re Nioshka A. N.*, 161 Conn. App. 627, 635–36, 128 A.3d 619, cert. denied, 320 Conn. 912, 128 A.3d 955 (2015).

In considering the minor child's emotional ties under § 17a-112 (k) (4), it is "appropriate for the trial court to consider the [child's] emotional ties to the preadoptive foster family in considering whether termination of the respondent's parental rights [is] in the children's best interest." *In re Nevaeh W.*, supra, 317 Conn. 731. In evaluating the minor child's emotional ties to the foster family, the court may consider the wishes of the minor child regarding with whom the child desires to live. See *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003) ("the court [properly] considered [the] express wish and desire [of the minor child, who was five years old] to live with the foster parents and not with the respondent").

In addition to considering the seven factors listed in § 17a-112 (k), "[t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) *In re Rafael S.*, 125 Conn. App. 605, 611, 9 A.3d 417 (2010). Furthermore, "in the dispositional stage, it is appropriate to consider the importance of permanency in children's lives." *In re Nevaeh W.*, supra, 317 Conn. 731.

We begin our analysis by addressing the respondent's three primary arguments concerning this claim. Concerning the court's finding that the department had made reasonable reunification efforts under § 17a-112 (k) (2), the evidence in the record does not support the respondent's contention that the department did not make reasonable efforts because she and Elijah were confined to a small, windowless room at the department's facility during visitation. Rather, the court reasonably could have found that the department, at least initially, provided diverse environments for visitation: a park, a barber shop, the doctor's office. Subsequent limitations on the nature of the visitations were, in part, reasonable responses to the respondent's actions. For example, although the record is somewhat unclear, the

court reasonably could have inferred that the department prohibited additional visitations at the park after Elijah fell from a piece of playground equipment when the respondent was not adequately supervising him. Additionally, the court reasonably could have found that the department's unwillingness to allow at-home visitation was justified by the respondent's continued contact, which she lied about, with Elijah's father.

Furthermore, unlike the adjudicatory phase of the proceedings, in which the petitioner must prove by clear and convincing evidence that the department made reasonable reunification efforts; *In re Oreoluwa O.*, 321 Conn. 523, 532, A.3d (2016); in the dispositional phase of the proceedings, whether the department made reasonable reunification efforts is just one of the many factors that the court must consider, and it does not have to be proven by clear and convincing evidence. See *In re Nioshka A. N.*, supra, 161 Conn. App. 636 ("the petitioner is not required to prove each of the seven factors by clear and convincing evidence" [internal quotation marks omitted]). Thus, to the extent that the department should have provided alternative visitation environments, this was only one factor out of many that the court weighed in determining the best interest of Elijah.

Concerning the court's reliance on the wishes of Elijah, the respondent misapprehends the court's findings. Although the trial court may consider the wishes of the minor child concerning with whom he or she would prefer to live, the court did not do so in this case. Elijah never testified regarding with whom he wished to live, and the court did not make any findings concerning his wishes.

The court, however, did rely heavily on Elijah's emotional ties to his foster parents and his lack of emotional ties to the respondent. See General Statutes § 17a-112 (k) (4). In particular, the court relied on evidence showing that Elijah had thrived with the foster family and viewed his foster parents as his psychological parents. Additionally, the court relied upon testimony from the foster mother and the department's employees, who testified that Elijah became distressed around the respondent. Although the respondent offers an alternative, plausible explanation for Elijah's distress—that the environment of the visitation room at the department's facility, and not the respondent, distressed him—we will not second guess the court's finding that Elijah had limited emotional ties to the respondent because the court reasonably could have inferred that Elijah's distress was caused by the respondent. See *In re Davonta V.*, supra, 285 Conn. 488 ("[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached" [internal quotation marks omitted]). Thus, contrary to the respondent's contention that the court improperly

relied upon Elijah's wishes, pursuant to § 17a-112 (k) (4), the court, in determining Elijah's best interest, properly relied upon evidence showing his strong emotional ties to his foster family and his lack of an emotional tie to the respondent.

Concerning the respondent's final argument, the court's finding that the respondent had not been prevented from maintaining a meaningful relationship with Elijah by the unreasonable acts or conduct of any person is supported by the record. Although the foster family arguably may have done more to prepare Elijah for visits with the respondent and may have initiated more personal contact with the respondent, the record reflects that the foster family did not create an impediment to the respondent maintaining a relationship with Elijah. Rather, the record establishes that the foster family made efforts to facilitate communication between the respondent and Elijah—weekly telephone calls, conveying information about Elijah via a journal, and allowing the respondent to attend Christmas at the foster family's home. Additionally, assuming that the foster family's actions did, to some extent, impede the respondent's ability to maintain a relationship with Elijah, the court was entitled to weigh the significance of this impediment in relation to the other factors that it considered, and we will defer to the weight that the trial court afforded each factor.

Even if we were persuaded by the respondent's arguments, the court's determination that termination of the respondent's parental rights was in Elijah's best interest is supported by the remaining factors set forth in § 17a-112 (k), by Elijah's need for stability and permanency, and by the court's determination that the respondent had failed to reach a degree of rehabilitation sufficient to satisfy the statute.

In addition to finding that Elijah had strong emotional ties to his foster family under § 17a-112 (k) (4), the court emphasized Elijah's need for stability and permanency, which weighed in favor of finding that termination of the respondent's parental rights was in Elijah's best interest. Furthermore, the court found, under § 17a-112 (k) (3), that the respondent had failed to comply sufficiently with the court-issued specific steps. The court particularly noted her lack of compliance with the court-ordered counseling, her disengagement with the department's parenting counselors, and her continued relationship with Elijah's father. This finding is not challenged on appeal.

This court previously has held that a trial court's determination that termination of parental rights is in the minor child's best interest is not clearly erroneous if "by clear and convincing evidence . . . the [petitioner has] shown that the respondent . . . failed to reach a degree of rehabilitation sufficient to satisfy the statute, coupled with the need for permanency in the

[child's life] . . . ." *In re Jermaine S.*, 86 Conn. App. 819, 836, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005). The trial court in this case found both that the respondent had failed to reach a degree of rehabilitation sufficient to satisfy the statute and that Elijah found stability and permanence with his foster family. On the basis of these findings, the court's determination that termination of parental rights was in Elijah's best interest is not clearly erroneous.

Moreover, it is unclear what weight the court afforded each of the seven factors listed in § 17a-112 (k). The court, however, determined that the seven statutory factors weighed in favor of termination of the respondent's parental rights. On the basis of the court's oral memorandum of decision, it may be inferred that it weighed heavily Elijah's need for stability and permanency, as well his emotional attachment to his foster parents, with whom he has lived for almost his entire life. Although the trial court's oral memorandum of decision was not a model of clarity or specificity, it considered the seven statutory factors in relation to Elijah's best interest. We will not reweigh these factors, but, rather, we defer to the trial court's judgment.

In sum, we conclude that the trial court, after weighing the appropriate factors, did not improperly conclude by clear and convincing evidence that termination of the respondent's parental rights was in the best interest of Elijah. Accordingly, we affirm the judgment of the trial court.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** July 7, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] In the same proceeding, the court also terminated the parental rights of Elijah's father, William R. Because he has not appealed from that judgment, we refer to Deborah G. as the respondent throughout this opinion.

[2] On January 25, 2013, Elijah was placed with his maternal aunt and uncle, who have served as his foster parents. He has resided with them throughout these proceedings and his foster parents intend to adopt him upon the termination of the respondent's parental rights.

[3] General Statutes (Supp. 2016) § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." See *In re Elvin G.*, 310 Conn. 485, 502, 78 A.3d 797 (2013) ("some portion of the language following clause (ii) is intended to modify clause (i) as well as clause (ii)").

We note that § 17a-112 (j) (3) (B) was amended in 2015; see Public Acts 2015, No. 15-159, § 1; however, the amendment is not relevant to this appeal. For convenience, references herein are to the revision codified in the 2016

supplement to the General Statutes.

[4] Prior to testifying at trial, the court conducted a partial canvass of the respondent regarding her election to testify, including the potential consequences of testifying. In particular, the court informed the respondent of her right to testify, but that she was not required to testify. The court also told her that it was the petitioner's burden to prove its claims by clear and convincing evidence and that she was not required to prove anything. The court questioned the respondent regarding whether she had sufficient time to consult with her attorney about her decision to testify. The respondent stated that she was satisfied with her attorney's advice and that she voluntarily had determined to testify. She further agreed that she was aware of the benefits and burden of testifying. The court, however, did not question the respondent specifically about whether she was aware that it could draw an adverse inference against her if she did not testify. Because she ultimately decided to testify, no adverse inference could be or was drawn against her.

[5] We note that the attorney for the minor child filed a brief pursuant to Practice Book § 79a-6 (c). The brief adopted the arguments submitted by the petitioner with respect to the respondent's *In re Yasiel R.* claim, but separately briefed and opposed the respondent's claims concerning the department's reasonable efforts to reunify the family and the best interest of the child.

[6] We note that the question of whether the supervisory rule announced in *In re Yasiel R.* should be applied to other, then pending cases is before our Supreme Court in *In re Egypt E.*, SC 19643 and SC 19644. Additionally, the petitioner's petition for certification to appeal from this court's decision in *In re Daniel N.* is pending before our Supreme Court.

[7] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ."

[8] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (2) termination is in the best interest of the child . . . ."

[9] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the [department] has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[10] In the portion of its decision addressing the adjudicatory phase of the trial, the court made the following findings in regard to the respondent's compliance with the court-ordered specific steps: "She has done well with some of these steps and [has been] noncompliant [with] or addressed others inadequately.

"Most notably, [the respondent] has maintained her sobriety. . . . The respondent] has also maintained steady employment. . . . As to housing,

[the respondent's] compliance has been noncompliant in part. . . . [The respondent] denied to the [department] that [the child's] father was residing with [her]. . . . [The respondent] was told to continue with individual counseling and did not do so for lengthy periods of time. . . . [She] has avoided the court-ordered counseling for a long time. She is in need of long-term counseling, and the court has no reason to believe that [she] would cooperate assiduously and fully with the court's orders and expectations.

"More troubling is that [the respondent] has a diagnosis of cocaine dependence in remission, and she is involved with [the] father, whom the department asserts has a decade long history of crack cocaine abuse. . . .

"The court specifically told [the respondent that] she was to have nothing to do with him and that she had to totally separate from him as she was enmeshed with him in a manner that was dangerous to her own recovery and her desire to reunify with her son. . . . Finally and most important, [the respondent's] parenting has been an issue throughout . . . . [She] has been visiting faithfully for years and making no progress. Two separate parenting educators and visitation supervisors testified, and hundreds of pages of observations and reports were put into evidence. Those reports establish near perfect attendance and a strong desire to bond with Elijah. They do not show a strengthening of the parent-child bond.

"Most reports indicate [the respondent's] inability to read Elijah's cues and her attempts to force unwanted attention upon Elijah. They also show [her] inability or unwillingness to follow parenting directions . . . ."

[11] The respondent argues that the proper standard of review for this court to apply to this claim is the standard clarified by our Supreme Court in *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015), *In re Gabriella A.*, 319 Conn. 775, 789–90, 127 A.3d 948 (2015), and *In re Oreoluwa O.*, 321 Conn. 523, 533, A.3d (2016). In those cases, the court held that "[w]e review the trial court's subordinate factual findings for clear error. . . . We review the trial court's ultimate determination that a parent has failed to achieve sufficient rehabilitation [or that a parent is unable to benefit from reunification services or that the department made reasonable reunification efforts] for evidentiary sufficiency . . . ." (Internal quotation marks omitted.) *In re Oreoluwa O.*, supra, 533; see *In re Gabriella A.*, supra, 789; *In re Shane M.*, supra, 587–88.

As we have previously stated, "we are disinclined to reverse decades of precedent from our Supreme Court by declaring that the best interest ground set forth in § 17a-112 (j) (2) is subject to similar analysis." *In re Nioshka A. N.*, 161 Conn. App. 627, 637 n.9, 128 A.3d 619, cert. denied, 320 Conn. 912, 128 A.3d 955 (2015). Additionally, we need not decide this issue because the evidence in this case supports the trial court's judgment under both standards. "Otherwise stated, if the evidence upon which we have relied in finding that the trial court's best interest determination was not clearly erroneous were considered under the evidentiary sufficiency standard, and, thus, was construed in the light most favorable to upholding the trial court's best interest determination; see *In re Shane M.*, supra, 588; that evidence, so construed, would be sufficient to prove by clear and convincing evidence that termination of the respondent's parental rights was in the best interest of the child." *In re Nioshka A. N.*, supra, 637 n.9