******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE SYDNEI V.*
(AC 38627)

Lavine, Mullins and Harper, Js.

*Argued April 5—officially released September 15, 2016***

(Appeal from Superior Court, judicial district of
Middlesex, Child Protection Session at Middletown,
Hon. Barbara M. Quinn, judge trial referee.)

*David J. Reich*, for the appellant (respondent).

*Benjamin M. Wattenmaker*, assigned counsel, for the
appellee (petitioner).

*George Jepsen*, attorney general, *Gregory T. D'Auria*,
solicitor general, and *Benjamin Zivyon* and *Carolyn
Signoralli*, assistant attorneys general, filed a brief for
the Commissioner of Children and Families as ami-
cus curiae.

*Opinion*

LAVINE, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights in her daughter (child) pursuant to General Statutes § 45a-717 (g) (2) (A), abandonment, and § 45a-717 (g) (2) (C), no ongoing parent-child relationship.[1] On appeal, the respondent claims that the court (1) violated her right to due process by failing to determine, during the dispositional phase of the termination of parental rights proceeding, that there would be some adverse effect to the child by failing to terminate her parental rights in the child, (2) erred in finding that it was in the child's best interests to terminate the respondent's parental rights as to the child, and (3) committed plain error by failing to canvass her prior to trial as required by *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015) (*Yasiel* canvass), and *In re Daniel N.*, 163 Conn. App. 322, 135 A.3d 1260, cert. granted, Conn. , A.3d (2016).[2] We disagree and, therefore, affirm the judgment of the trial court.

In its memorandum of decision, the court, *Hon. Barbara M. Quinn*, judge trial referee, made the following findings of fact. J.V. and his wife, K.V., are the child's legal guardians (guardians).[3] In December, 2014, in the Court of Probate for the District of Danbury, the petitioner, J.V., filed an application to terminate the respondent's parental rights, pursuant to General Statutes § 45a-717. The application alleged that the respondent's parental rights should be terminated on the ground of abandonment; General Statutes § 45a-717 (g) (2) (A); and no ongoing parent-child relationship; General Statutes § 45a-717 (g) (2) (C).[4] Pursuant to a motion filed by counsel for the child, the matter was transferred to the Superior Court for Juvenile Matters. See General Statutes § 45a-715. The trial was conducted between October 5 and October 8, 2015.

The respondent and the child's father had dated one another while they were in high school. They later married and had one child who is the subject of the present termination proceeding. The child was born in 2005. The couple's relationship was marked by domestic violence and alcohol abuse. In 2006, they were living apart from one another. Despite their differences, the couple tried to "patch things up." One evening they went out to dinner and were involved in a serious motor vehicle crash. The child's father was killed at the scene, and the respondent suffered serious injuries. The accident investigation concluded that the respondent and the child's father were intoxicated with blood alcohol levels in excess of the legal limit.

The respondent subsequently married G.U. with whom she has a son, Z. The respondent's relationship with G.U. also was characterized by domestic violence, and drug and alcohol abuse. The child and Z were

exposed to a great deal of turbulence. As a consequence of their domestic violence, the respondent and G.U. were arrested on numerous occasions. Although the respondent reported that G.U. instigated the violence, the court found that the respondent was the primary aggressor. In January, 2010, the respondent was so angry that she attacked G.U. with a knife and tried to cut his face. The child, who was five years old at the time, was awakened from sleep by the fracas. She still recalled the incident at the time of trial.

On January 17, 2010, the Department of Children and Families (department) obtained an order of temporary custody and removed both children from the care of respondent and G.U. and placed them with the guardians. The child was adjudicated neglected on November 22, 2010, and placed in the guardians' care.[5] When the child entered the guardians' home, she was terrified of knives, including the mere mention of them. She was shy, withdrawn, anxious, and suffered night terrors. When she was traveling in a motor vehicle, the child became nervous and fearful that the respondent was following and would take her away. The guardians placed her in therapy, which was of some benefit to her.

At the time of the neglect proceedings, the court, *Sommer*, *J.*, ordered once-a-week visitation between the respondent and the child and joint counseling for them. The therapist was to work with the respondent and the child to improve their relationship and expand visitation and was authorized to make recommendations regarding the progress, duration, and frequency, as well as the supervision, of the visits between the respondent and the child. The hoped-for normalization of the parent-child relationship between the respondent and the child did not take place due to the trauma the child had suffered as a result of the constant violence in her parental home. The child did not want to talk about her life with the respondent, even five years later at the time of the termination of parental rights trial.

The respondent and the child had scheduled visitation during the first year and one-half following the transfer of guardianship. The child was anxious, however, and her symptoms increased prior to each visit. It was difficult to schedule the time and location of the visits. The guardians asked the respondent to provide adequate notice so that they could prepare the child emotionally to be ready for the visit. The respondent often gave notice at the last minute, after the child had gone to bed for the night, which made it difficult for the guardians to prepare her for the visit, which took place at restaurants, in the community, and in parks. Sometimes Z or the court appointed guardian ad litem attended the visits. On the way to the visits, the child complained of having a stomach ache and that she needed to throw up. The visits lasted for approximately one hour, sometimes longer. Often the child wished the

visits to be shortened. Occasionally, the respondent brought the child a gift. Once, the respondent took the child to a "Build-a-Bear" store, where she purchased a teddy bear for the child. When the child returned to the guardians' home, she wanted to throw out the bear. By early 2012, the visits between the respondent and the child were sporadic and far between. The two were no longer were engaged in joint therapy, and the therapist did not recommend increasing the amount of time the respondent spent with the child.

In March, 2012, the respondent filed a motion for increased visitation. The parties reached an agreement that, after three individual therapy sessions, the respondent could have therapeutic visits with the child. The respondent, however, failed to attend the three required therapy sessions, and all visits ceased. The respondent last visited the child on April 9, 2012. The respondent and child have had no contact since then.

The respondent claimed that she failed to continue therapy and engage in therapeutic visits with the child for financial reasons. She had no insurance and inadequate income from her employment. The court found no evidence that the respondent made any attempt to seek therapy on a sliding pay scale or to ask for help from others, such as the guardian ad litem, to find affordable therapy. She made only a minimal effort to comply with the court-ordered conditions for increased access to the child.

In addition to failing to find means by which she could increase her access to the child, the respondent did not take advantage of other avenues open to her that would demonstrate her commitment to the child. The respondent provided no financial support for the child nor did she send the child letters or gifts. She failed to inquire about the child's school progress, medical appointments, or her life in general. The court found that whatever her level of concern may have been, the respondent failed to manifest it in a concrete manner to inform herself about the child's daily life and progress.

The respondent filed another motion for visitation in December, 2013. The department investigated and filed a visitation report dated July 7, 2014. After reviewing the history and the child's relationship with the respondent, the department did not recommend visitation.

Court-ordered psychological evaluations of both the respondent and the child were performed in October, 2014, by Deborah Gruen, a clinical and forensic psychologist. The guardians also were interviewed. On the basis of Gruen's testimony at trial, the court found that the respondent was an emotionally sensitive person who has a propensity for unstable relationships. She can be irritable, demanding, and charming at the same time, is manipulative in her relationships, and exercises poor judgment. Although Gruen did not provide a diagnosis,

she found that the respondent exhibits antisocial behavior and borderline personality traits. She recommended that the respondent receive intensive psychotherapy with a seasoned clinician to deal with the trauma the respondent herself has experienced, both as a child and in her adult relationships.[6] Without intensive treatment, Gruen's prognosis for the respondent is guarded. Because the respondent was pregnant in November, 2014, Gruen recommended that the respondent wait at least six months before entering therapeutic intervention. This period of time was needed to give the respondent time to adjust to all of the significant changes that were coming to her life.

The court asked Gruen to answer additional questions, which she did in August, 2015. Gruen summarized the treatment the respondent had received and results of the conversation she had with the respondent's clinician. By the end of July, 2015, the respondent had had twenty-two sessions of therapy and had made substantial strides to address her long-standing trauma-related issues. The respondent has stable employment with considerable management responsibilities and has custody of her youngest child. Z is in her care several times a week, but his father is his primary caretaker. The respondent is beginning the difficult introspection and emotional work that she needs to improve herself for the sake of her children as well as herself. The court found that the respondent's changes came about after the child had been out of the respondent's primary care for five years.

According to Gruen, the child has only bad memories of life with the respondent, and she does not wish to see or interact with her. The child suffers underlying anxiety and needs to strengthen her ability to acknowledge her anxieties and address her fears on a more realistic basis. The therapist did not recommend that the child visit with the respondent until the respondent had undertaken intensive therapy. In the spring of 2015, the child was in therapy, having been diagnosed with posttraumatic stress, as a result of the trauma she has witnessed. The child's therapist echoed Gruen's concern about the child's building a relationship with the respondent. Children in her situation are very cautious, hostile, and estranged. The therapist could not predict what would happen if the child and respondent met, as there could be widely different outcomes. As the child grows, however, the therapist opined that she will need some access to the respondent; children who are in the child's situation grow-up "missing a part of themselves," which is necessary for their stable, balanced, and mature adult development.[7]

The court found, according to the guardian ad litem, that in 2011, the child was very anxious and uncomfortable whenever the respondent was mentioned. The child wanted to remain with the guardians, and her

attitude was unchanged in 2015. She is settled in the guardians' home where she is a happy and loving ten year old, who is enthusiastic about school and the things that she does with her family. In the opinion of the guardian ad litem, termination of the respondent's parental rights is in the best interest of the child.

The court analyzed the facts and the grounds alleged for termination of the respondent's parental rights in the child in the adjudicatory phase of the proceedings. As to the ground of abandonment alleged pursuant to § 45a-717 (g) (2) (A),[8] the court noted that the appellate courts of this state have held that "[t]he commonly understood general obligations of parenthood entail these minimum attributes: (1) [the expression of] love and affection for the child; (2) [the expression of] personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) *In re Kezia M.*, 33 Conn. App. 12, 18, 632 A.2d 112, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).

Abandonment has been defined as a parent's failure to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child, and maintain implies a continuing, reasonable degree of interest, concern, or responsibility and not merely a sporadic showing thereof. See *In re Paul M.*, 148 Conn. App. 654, 664, 85 A.3d 1263, cert. denied, 311 Conn. 938, 88 A.3d 550 (2014).

On the basis of the clear and convincing evidence before the court, it found that the respondent had not demonstrated the minimum attributes of parenthood as they are understood in the law. She has not expressed love and affection toward the child in any meaningful way and has failed to inquire about the child's health, education, and general well-being, and has not made any effort to provide financial support for the child. Although the court did not doubt that in her heart, the respondent loves the child and wishes that she could visit with her, the respondent is aware that the child does not wish to have contact with her. The court found that the respondent is wise enough not to force contact with the child.

The court credited the respondent with good intentions, but noted that thoughts and wishes are insufficient to sustain a child. The court found that the respondent had choices to make in the five years since the child left her care. On three separate occasions, in 2010, 2012, and 2014, the respondent was offered visits with the child if she entered therapy. It was not until 2014 that the respondent began the arduous process of making positive changes in her life. Although the respondent has made sufficient progress to enable her

to have her two younger children[9] in her care on a regular basis, that progress has been too little and too late for the child who is the subject of the present termination of parental rights petition.

The respondent failed to write to the child or to send her gifts. She failed to communicate with the guardians as to the child's well-being. Although the respondent believes that the guardians prevented her from doing so, she failed to reach out to take advantage of the resources available to her, such as the child's guardian ad litem and attorney. The court concluded that the clear and convincing evidence of respondent's failures constitutes legal abandonment.

Although a court need find only one statutory ground to terminate parental rights in a child; see *In re Alexander C.*, 67 Conn. App. 417, 427, 787 A.2d 608 (2001), aff'd, 262 Conn. 308, 813 A.2d 87 (2003); the court adjudicated the second reason alleged by the petitioner. To grant a termination of parental rights petition on the ground that there is no ongoing parent-child relationship pursuant to § 45-717 (g) (2) (C),[10] the court must find that no parent-child relationship exists and that looking prospectively, it would be detrimental to the child's best interest to allow time for such a relationship to develop. See *In re Christian P.*, 98 Conn. App. 264, 269, 907 A.2d 1261 (2006). In the present case, the court found that there is no remaining parent-child relationship between the respondent and the child; it evaporated in the long period of time in which the respondent had no contact with the child. The critical issue, the court found, was whether it is detrimental to the child's best interest to permit more time for such a relationship to develop.

The court found that the child is happy and secure in the guardians' home and her school. The mere mention of the respondent upsets the child. The child has no positive memories of the respondent. Permitting more time in the child's young life for such a relationship to develop is detrimental to the child's best interest when the child has been out of the respondent's care for more than one half of her life. The court concluded from the clear and convincing evidence that the petitioner had proven that there was no ongoing parent child relationship and that it was not in the child's best interest to permit more time for such a relationship to develop.

The court then made the statutory findings required in the dispositional phase of the proceedings. See General Statutes § 45a-717 (h). The court found that the dispositional factors all pointed toward a finding that termination of parental rights was in the child's best interest. The child is in crucial need of safety, stability, and permanency, which the respondent is not in a position to provide. The court concluded on the basis of the clear and convincing evidence that termination of the respondent's parental rights is in the child's best inter-

est. Additional facts will be set out as necessary.

Before addressing the respondent's claims on appeal, we set forth "the well established legal framework for deciding termination of parental rights petitions. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in [§ 45-717 (g)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Elijah G.-R.*, 167 Conn. App. 1, 18–19, A.3d (2016).

I

The respondent's first claim is that "procedural due process requires the court to determine in the dispositional phase that there are adverse effects on the child that outweigh the mother's constitutionally protected parental rights before those rights can be terminated."[11] This claim, which is in derogation of § 45a-717 (h), is made up of whole cloth, and we reject it.

Our legislature has created a constitutionally viable statutory scheme to be followed by our courts when adjudicating petitions to terminate the parental rights of parents in their children. General Statutes §§ 45a-717 and 17a-212,[12] which are applicable in the Probate Court and Superior Court respectively, consist of "two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights . . . exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 788, 952 A.2d 1280 (2008). In the present case, the court found that the petitioner had proved by clear and convincing evidence the grounds alleged for termination of the respondent's parental rights in the child. On appeal, the respondent does not challenge the court's findings and conclusions in the adjudicatory stage of the termination proceeding. Rather, the respondent claims that her right to procedural due process was violated because the court failed to perform a balancing test pursuant to *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to determine the adverse effects of the failure to terminate her parental rights on the child against her constitutionally protected right to raise her child. Such an analysis in this case is unwarranted as the statutory

scheme passes constitutional muster. See *In re Nevaeh W.*, 317 Conn. 723, 740, 120 A.3d 1177 (2015); *In re Eden F.*, 250 Conn. 674, 690–91, 741 A.2d 873 (1999).

Section § 45a-717 (h) sets forth six guidelines that the court must consider and on which it must make written findings, and our Supreme Court has determined that this statutory provision is the guide to determining the best interest of the child. The statutory scheme "carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent." (Internal quotation marks omitted.) *In re Eden F.*, supra, 250 Conn. 689. Nothing in § 45a-717 (h), which relates to the best interest of the child in the dispositional phase of the termination proceeding, requires the court to engage in a *Mathews* balancing analysis or to find a detriment to the child if termination of parental rights is not granted.

The respondent relies on *Santosky* v. *Kramer*, 455 U.S. 745, 754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). *Santosky* does not support her position. "After the State has established parental unfitness at the intital proceeding, the court may assume at the dispositional stage that the interests of the child and the natural parents do diverge." (Emphasis omitted.) Id., 760. In the dispositional phase of a termination proceeding, the emphasis shifts "from the conduct of the parent to the best interest of the child." *In re Romance M.*, 229 Conn. 345, 356–57, 641 A.2d 378 (1994). As the commissioner has pointed out in her brief, the respondent's claim, in actuality, is not related to procedural due process. Rather, the respondent seeks to add a substantive requirement to the statutory scheme enacted by our legislature. In other words, the respondent's claim is related to substantive, not procedural, due process. See *In re Azareon Y.*, 309 Conn. 626, 640, 72 A.3d 1074 (2013) (our Supreme Court observed that similar claim was one of substantive, not procedural, due process). For the foregoing reasons, the respondent's claim fails.

II

The respondent's second claim is that the trial court erred by finding that there was clear and convincing evidence that it was in the child's best interest to terminate the respondent's parental rights in her.[13] We do not agree.

The substance of the respondent's claim is that the evidence presented as to the dispositional phase of the termination proceeding was marginal. She correctly notes that the child has been in a safe and stable home since 2010, and that the respondent has done nothing to jeopardize the placement and is not seeking reunification. She argues, therefore, that because the child is in a stable, permanent placement and the respondent is

not negatively affecting that placement, there is no clear and convincing evidence that her parental rights should be terminated because it is in the best interest of the child. To support her claim, the respondent points to Gruen's testimony that the child, at some time in the future, may benefit from contact with the respondent. The respondent's argument is unavailing.

"The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) *In re Shyina B.*, 58 Conn. App. 159, 167, 752 A.2d 1139 (2000). "In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child." (Internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App. 819, 835, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005). In making that determination, the court must consider the factors delineated in § 45a-717 (h).[14]

The court made the following findings of fact with respect to the dispositional phase of the proceedings. The department was involved with the respondent, the child, and Z at the time the children were removed from her care. The department's involvement terminated when the child's guardianship was transferred to the guardians. The department saw no child protection issues following the transfer of guardianship. Thereafter, the department had no obligation to offer the respondent services.

At the time the child's guardianship was transferred, the court ordered visits between the respondent and the child, but the respondent did not comply with the order. The guardians did comply by offering the respondent visits with the child.

At the time of the termination hearing, the child was ten years old and had no relationship with the respondent. She is an anxious child and becomes concerned whenever the respondent is mentioned. The child has no fond memories of the respondent and wishes to remain permanently in the guardians' home and to be adopted by them.

The respondent failed to make adequate efforts to have the child returned to her home. She abandoned the child and failed to communicate with the guardians in any meaningful way. At the time of the termination of parental rights proceeding, the respondent was engaged in therapy and had made significant strides, but those strides were too late for the child, who had grown deeply attached to others. A child's sense of time is not the same as an adult's. Most of the child's conscious life has been spent with her guardians, not the respondent.

The court found that, although the respondent believes that the guardians have prevented her from having reasonable visits with the child, the evidence demonstrates that the respondent failed to take the steps she should have taken to maintain access to the child. Although the respondent's past economic circumstances have made her life more challenging, those circumstances, in and of themselves, did not prevent her from maintaining a reasonable relationship with the child.

"It is axiomatic that a trial court's factual findings are accorded great deference. Accordingly, an appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [E]very reasonable presumption is made in favor of the trial court's ruling. . . . Additionally, in reviewing the court's findings under the dispositional phase of the proceedings, it is appropriate to read the trial court's opinion as a whole, including its findings in the adjudicatory phase." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Elijah G.-R.*, supra, 167 Conn. App. 29–30.

We carefully have reviewed the court's memorandum of decision, including its factual findings in the adjudicatory phase of the proceedings, and reviewed the record. We conclude that the court's finding that termination of the respondent's parental rights is in the best interest of the child is not clearly erroneous. At the time of trial, the child had resided with her guardians for approximately five years, she is anxious and fearful of the respondent, and she does not want to visit with her. In fact, there have been no visits between the respondent and the child for an extended period of time. The underlying facts support the court's conclusion that the anxious child who is the subject of the termination petition is in need of stability and permanency and that termination of the respondent's parental rights is in her best interest. The respondent's claim therefore fails.

III

The respondent's third claim, which she raised for the first time during oral argument in this court, is that the court committed plain error by failing to canvass her prior to trial as required by *In re Yasiel R.*, supra, 317 Conn. 773. She argues that we should reverse the judgment of the trial court pursuant to *In re Daniel N.*, supra, 163 Conn. App. 322.[15] We decline to grant the relief requested because this case is procedurally distinguishable from *In re Daniel N.*,[16] and on appeal, the respondent has not demonstrated that failure to reverse the court's judgment terminating her parental rights in

the child will result in manifest injustice and erode the public's confidence in the integrity of the judicial system. The record demonstrates that at trial, the respondent exercised all of the rights of which the *Yasiel* canvass was intended to inform her.

We briefly review the history of the pretrial canvass of respondent parents in termination of parental rights cases as established in *In re Yasiel R.*, supra, 317 Conn. 773. In that case, the respondent mother waived her right to a trial and did not contest the allegations of the petition to terminate her parental rights in her children, challenge the evidence presented against her, or present evidence of her own.[17] Id., 775–76. After the trial court terminated the mother's parental rights in her children, she appealed to this court, which affirmed the judgments of the trial court. *In re Yasiel R.*, 151 Conn. App. 710, 721, 94 A.3d 1278 (2014), rev'd, 317 Conn. 773, 120 A.3d 1168 (2015). Our Supreme Court granted her petition for certification to appeal from the judgment of this court. *In re Yasiel R.*, 314 Conn. 907, 99 A.3d 1169 (2014).[18] In resolving the appeal, our Supreme Court concluded pursuant to its analysis under *Mathews* v. *Eldridge*, supra, 424 U.S. 335, that due process "does not require that a trial court canvass a respondent who is represented by counsel when the respondent does not testify or present witnesses and the respondent's attorney does not object to exhibits or cross-examine witnesses." *In re Yasiel R.*, supra, 317 Conn. 787–88.

The court, however, considered whether it should exercise its supervisory authority to require a canvass prior to a termination of parental rights trial. Id., 788. The court concluded that "the lack of a canvass of all parents in a parental rights termination trial may give the appearance of unfairness insofar as it may indicate a lack of concern over a parent's rights and understanding of the consequences of the proceeding. Therefore, [it] conclude[d] that public confidence in the integrity of the judicial system would be enhanced by a rule requiring a brief canvass of all parents immediately before a parental rights termination trial so as to ensure that the parents understand the trial process, their rights during the trial and the potential consequences." Id., 793–94. The court, therefore, invoked its "supervisory powers to enunciate a rule that is not constitutionally required but that [it thought] is preferable as a matter of policy." (Internal quotation marks omitted.) Id., 793.

The court outlined the following canvass of a respondent in a termination of parental rights proceeding to be undertaken prior to a termination of parental rights trial. "In the canvass, the respondent should be advised of: (1) the nature of the termination of parental rights proceeding and the legal effect thereof if a judgment is entered terminating parental rights; (2) the respondent's right to defend against the accusations; (3) the

respondent's right to confront and cross-examine witnesses; (4) the respondent's right to object to the admission of exhibits; (5) the respondent's right to present evidence opposing the allegations; (6) the respondent's right to representation by counsel; (7) the respondent's right to testify on his or her own behalf; and (8) if the respondent does not intend to testify, he or she should also be advised that if requested by the petitioner, or the court is so inclined, the court may take an adverse inference from his or her failure to testify, and explain the significance of that inference. Finally, the respondent should be advised that if he or she does not present any witnesses on his or her behalf, object to exhibits, or cross-examine witnesses, the court will decide the matter based upon evidence presented during trial. The court should then inquire whether the respondent understands his or her rights and whether there are any questions." Id., 795.

Our Supreme Court issued its decision in *In re Yasiel R.* on August 18, 2015. Trial in the present termination of parental rights case was held on October 5, 6, and 8, 2015, a bit more than a month after *In re Yasiel R.* was decided. The court in the present case, therefore, should have canvassed the respondent before the commencement of trial, but did not. Neither of the parties brought the omission to the attention of the court,[19] and the respondent did not file a motion for nonsuit or a motion to open the judgment. The respondent also did not raise a claim concerning a *Yasiel* canvass in her appeal or initial brief in this court. Rather she waited until the time of oral argument before this court to request supplemental briefing on the issue. See footnote 2 of this opinion.

In her supplemental brief, the respondent tacitly acknowledged that her claim regarding the lack of a *Yasiel* canvass was unpreserved by requesting that the termination judgment be reversed pursuant to the plain error doctrine and *In re Daniel N.*, supra, 163 Conn. App. 322. *In re Daniel N.*, however, is distinguishable in that the trial court in that case terminated the respondent's parental rights prior to our Supreme Court's decision in *In re Yasiel R.*[20] This court decided the *In re Daniel N.* appeal on which the respondent relies after our Supreme Court issued its decision *In re Yasiel R.* The question in the *In re Daniel N.* appeal in this court was whether *In re Yasiel R.* should be applied retroactively to reverse the termination of parental rights of the respondent in that case.[21] That is not the situation in the present case in which trial took place after *In re Yasiel R.* was decided. The question before us is not whether *In re Yasiel R.* should be applied retroactively, but whether the judgment terminating the respondent's parental rights should be reversed on the basis of plain error. This court did no harmful error analysis in *In re Daniel N.* See footnote 20 of this opinion. We conclude that the judgment terminating the respondent's parental

rights should not be reversed because the respondent has failed to demonstrate that a failure to do so would result in manifest injustice.

We begin with the well established legal framework for claims of plain error. "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situation [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . .

"[Our Supreme Court has] clarified the two step framework under which we review claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernible on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the [respondent] simply to demonstrate that his position is correct. Rather, [to prevail] the party [claiming] plain error [reversal] must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . .

"In addition, although a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of the doctrine. Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly

unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Internal quotation marks omitted.) *Zuberi* v. *Commissioner of Correction*, 140 Conn. App. 839, 843–44, 60 A.3d 337, cert. denied, 308 Conn. 931, 64 A.3d 330 (2013).

The substance of the respondent's claim on appeal is that because the court failed to canvass her prior to the termination of parental rights trial, a manifest injustice occurred; but she has failed to demonstrate that such an injustice occurred. Although it was error for the court to fail to conduct a *Yasiel* canvass of the respondent prior to trial, the respondent has provided no analysis as to how that failure deprived her of the trial rights to which she was entitled. "[M]erely demonstrating that a trial court has violated a supervisory mandate is not alone enough to warrant a reversal." *In re Leilah W.*, 166 Conn. App. 48, 63,    A.3d   (2016); see *State* v. *Sanchez*, 308 Conn. 64, 77–78, 60 A.3d 271 (2013); see also *State* v. *Smith*, 275 Conn. 205, 237, 881 A.2d 160 (2005) (whether trial court's failure to obey supervisory authority of Supreme Court results in manifest injustice must be considered on case specific, fact-based inquiry).

*State* v. *Smith*, supra, 275 Conn. 205, is instructive "because it demonstrates that a trial court's failure to comply with a supervisory rule does not automatically require reversal and a new trial in all cases. In *Smith*, the defendant raised an unpreserved claim that he was entitled to a new criminal trial because the trial court utilized language in its instructions to the jury that our Supreme Court, pursuant to its supervisory powers, previously had instructed courts to refrain from using. . . . The Supreme Court determined, consistent with its decision in [*State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002)], that the trial court's use of the prohibited language did not implicate the defendant's constitutional rights, and, thus, he was not entitled to [review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)]. . . . Further, despite the trial court having clearly violated a supervisory rule, the Supreme Court concluded that the defendant was not entitled to a reversal either under the plain error doctrine . . . or pursuant to the court's supervisory authority. . . .

"With respect to whether the trial court's action amounted to plain error, the Supreme Court explained that although it had directed trial courts to discontinue use of the challenged jury instruction language because it was concerned about the danger of misleading the jury, it was unconvinced in the case before it that any such danger actually existed or that the trial court's error in using the language was so significant as to affect the fairness and integrity of or the public confidence in the proceeding. . . . Similarly, the Supreme Court declined to reverse the judgment on the basis of its

supervisory authority, stating: The trial court's failure to heed our direction to discontinue the use of the challenged jury instruction was not such an extraordinary violation that it threatened the integrity of the trial, and it certainly did not rise to the level of implicating the perceived fairness of the judicial system as a whole. The defendant does not suggest that the trial court deliberately disregarded this court's mandate. Nor do we consider a new trial necessary to emphasize the importance of our direction in *Aponte* to the trial courts of this state. . . . In other words, merely demonstrating that a trial court has violated a supervisory mandate is not alone enough to warrant a reversal. The party raising the issue of noncompliance also must demonstrate actual harm." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Leilah W.*, supra, 166 Conn. App. 62–63.

The undisputed fact is that the respondent was represented by counsel at the termination of parental rights trial. Our Supreme Court recognized that, prior to *In re Yasiel R.*, "[w]hen the respondent is represented by counsel, the current procedures in place adequately protect the respondent from any claimed constitutional deficiencies." *In re Yasiel R.*, supra, 317 Conn. 785. "It has frequently been recognized, albeit in other contexts, that we strongly presume that counsel's professional assistance was reasonable, and the [respondent] has the burden to overcome the presumption that [her] attorney was employing sound trial strategy. . . We evaluate the conduct from trial counsel's perspective at the time. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) Id. In the present appeal, the respondent does not claim error on the part of her counsel.

Quite recently, this court has had occasion to address claims that the judgments terminating the appellants' parental rights should be reversed because the trial courts canvassed them after, rather than prior to, the presentation of evidence but prior to the courts issuing their decisions. See *In re Elijah G.-R.*, supra, 167 Conn. App. 1; *In re Leilah W.*, supra, 166 Conn. App. 48. In both *In re Elijah G.-R.* and *In re Leilah* the respondents were represented by counsel. Although there were some differences in the way in which the canvasses were conducted in those cases, this court concluded that the stated purpose underlying the *Yasiel* canvass was met even though the respondents were not canvassed prior to the termination trial. In coming to that conclusion in each case, this court considered the factors the *Yasiel* canvass was intended to address and the actual trials of the subject cases.[22] This court found in both of those cases that on appeal, the respondents failed to explain how they were harmed by the timing of the *Yasiel* canvass, whether they would have moved

for a new trial or asked that the evidence be opened and what additional evidence they might offer that would have made a difference in the trial. The respondents in each case argued only that the timing of the canvass itself was harmful. See *In re Elijah G.-R.*, supra, 167 Conn. App. 18 (noting that claim had been expressly rejected in *In re Leilah W.*). Although the trial court in the present case did not canvass the respondent, she has failed to explain what she did not know or understand about the termination of her parental rights without the court's canvass. She has not explained what she would have done differently if the court had canvassed her and how the outcome of the case would be different. In other words, the respondent has failed to explain how the court's failure to canvass her was harmful per se.

Moreover, the respondent has failed to meet her burden as to the second prong of the plain error doctrine: that a failure to reverse the trial court's judgment will result in manifest injustice. The record discloses that the respondent was represented by counsel, who cross-examined the petitioner's witnesses, and objected to evidence. She presented her own witnesses and evidence and argued in opposition to the termination of her parental rights. The respondent testified on her own behalf. It appears, as our Supreme Court has said, that the "[w]hen the respondent is represented by counsel, the current procedures in place adequately protect the respondent from any claimed constitutional deficiencies." *In re Yasiel R.*, supra, 317 Conn. 785. The question we must therefore address is whether the absence of a canvass in the present case is likely to cause the public to lose faith in the integrity of our judicial system. On the basis of our review of the proceedings in the trial court, we conclude that such an outcome would surely not occur. Although the court's failure to give a *Yasiel* canvass is clear, obvious and indisputable, the respondent has failed to demonstrate that the failure has resulted in a fundamentally unfair termination proceeding that would cause the public to lose faith in the judicial system.[23] She therefore cannot prevail on her plain error claim that the judgment terminating her parental rights in the child should be reversed.

In concluding that the judgment terminating the respondent's parental rights in the child should not be reversed, we are mindful that our Supreme Court repeatedly has addressed the need for permanency in the life of a child. See, e.g., *In re Nevaeh W.*, supra, 317 Conn. 732 ("[v]irtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments" [internal quotation marks omitted]). The child at issue here has been living with her guardians since 2010; she is eleven years old, has no relationship with the respondent, and wishes to be adopted by her guardians. It is now 2016. To reverse the judgment at this point

in the child's life, we believe, would in and of itself undermine the public's confidence in the integrity of our judicial system in that the child would be left in limbo for an indeterminate period of time until a new trial can be held. We conclude that the respondent has not carried her burden to demonstrate that the judgment should be reversed to avoid a manifest injustice.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** September 15, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The Commissioner of Children and Families (commissioner) filed a motion for permission to file a brief as amicus curiae in the present matter. This court granted the commissioner's motion.

[2] *In re Yasiel R.*, supra, 317 Conn. 773, was decided our Supreme Court in August, 2015. The respondent filed her initial brief in this court in January, 2016, but did not raise a claim concerning the lack of a *Yasiel* canvass. Subsequent to oral argument in this court, however, the respondent filed a motion requesting permission to file a supplemental brief to address "Whether the termination of [her] parental rights should be reversed because [this court] in *In re Daniel N.*, 163 Conn. App. 322, [135 A.3d 1260, cert. granted, Conn. , A.3d ] (2016), [held] that the canvass requirement in *In re Yasiel R.*, [supra, 317 Conn. 773], must be applied retroactively, and the trial court in this case did not canvass [the respondent] as required." We granted the motion permitting supplemental briefing. As we explain in part III of this opinion, however, *In re Daniel N.* does not control the respondent's claim.

[3] The child's father, J.V.'s brother, is deceased.

[4] The petitioner also alleged that the respondent had failed to achieve a sufficient degree of rehabilitation; General Statutes § 45a-717 (g) (2) (D); but subsequently withdrew that allegation.

[5] Z also was adjudicated neglected and was placed with his father, G.U.

[6] Gruen recommended intensive therapy twice a week for at least six consecutive months and ongoing individual treatment if reunification sessions with the child begin.

[7] On January 14, 2015, the court, *Randolph, J.*, ordered the department to complete a termination of parental rights study. The study, which is dated April 6, 2015, states in relevant part: "[The child] stated that she is doing well with her uncle, aunt and cousins. She stated she wants to be adopted because this [is] her permanent home and she feels 'safe here.' This social worker explained that in order for her to be adopted her mother's parental rights will have to be terminated; explaining what this means. She stated she is in agreement with her mother's parental rights being terminated. This social worker told [the child] that since she knows her mother, when she gets older she could still visit her if she wanted to. [The child] shook her head no and said she will not want to visit. This social worker asked her why and she stated 'because it brings back bad memories.' [The child] became tearful as she talked about this."

[8] General Statutes § 45a-717 (g) provides in relevant part: "[T]he court may approve a petition terminating the parental rights and may appoint a guardian of the person of the child . . . if it finds, upon clear and convincing evidence, that (1) termination is in the best interest of the child, and (2) (A) the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . ."

[9] The respondent has had a third child.

[10] General Statutes § 45-717 (g) provides in relevant part: "[T]he court may approve a petition terminating the parental rights and may appoint a guardian of the person of the child . . . if it finds, upon clear and convincing evidence, that (1) the termination is in the best interest of the child, and (2) . . . (C) there is no ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on

a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child . . . ."

[11] The respondent does not dispute the court's findings made during the adjudicatory stage of the proceedings that the respondent abandoned the child and that there is no ongoing parent-child relationship.

[12] The best interest factors to be considered in the probate statute; General Statutes § 45a-717 (h); and the juvenile statute; General Statutes § 17a-112 (k); are substantially similar.

[13] The respondent raised this second claim as an alternative argument, if we determined that her constitutional right to due process was not violated. See part I of this opinion.

[14] General Statutes § 45a-717 (h) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by a child-placing agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or child-placing agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[15] Our Supreme Court certified the following issue in *In re Daniel N.*, Conn. , A.3d (2016): "Did the Appellate Court correctly reverse the trial court's judgment ordering termination of parental rights by concluding that this court's decision in *In re Yasiel R.*, 317 Conn. 773 (2015), controlled the result of this case?"

[16] The termination of parental rights trial in *In re Daniel N.*, supra, 163 Conn. App. 322, took place prior to our Supreme Court's issuing its decision in *In re Yasiel R.* The issue in this court, therefore, was whether *In re Yasiel R.* applied retroactively. Moreover, on appeal, the respondent in *In re Daniel N.* did not seek reversal of the judgment terminating his parental rights pursuant to the plain error doctrine, as the respondent in the present case does.

[17] The relevant procedural history of *In re Yasiel R.* follows. "Due to the respondent's various arrests and her mental health and substance abuse issues, the petitioner [the commissioner] filed petitions to terminate [the respondent's] parental rights in November, 2012. According to the petitioner, the court, on December 11, 2012, advised the respondent of her trial rights, entered denials to the petitions on her behalf, and appointed her an attorney. A contested hearing then was scheduled for November 12, 2013. At that hearing, the respondent's counsel stated that although [the respondent is] not in agreement with the [termination of parental rights], she cannot bring herself to consent today. That being said, she's in agreement with the court taking the case on the papers. She's in agreement to the exhibits that . . . have been entered. Her counsel then stated that the respondent wants the court to be aware that things have significantly changed for her over the last two years and continued to explain those changes. At no time did the court canvass the respondent personally to question her decisions not to contest the petitioner's exhibits and to waive her right to a full trial. It stated only that I think I understand your position, and I will certainly consider that [you've made great progress] when I'm reviewing all the material . . . ." (Footnotes omitted; internal quotation marks omitted.) *In re Yasiel R.*, supra, 317 Conn. 777.

[18] Our Supreme Court granted certification as to the following relevant issue: "Does the due process clause of the fourteenth amendment to the United States constitution require that a trial court canvass a parent personally about his or her decision not to contest the exhibits presented to the court against him or her in a parental termination proceeding?" (Internal quotation marks omitted.) *In re Yasiel R.*, supra, 314 Conn. 907. Our Supreme Court determined that due process does not require a *Yasiel* canvass. See *In re Yasiel R.* supra, 317 Conn. 787–88.

[19] The parties are presumed to know the law; *Provident Bank* v. *Lewitt*, 84 Conn. App. 204, 209, 852 A.2d 852, cert. denied, 271 Conn. 924, 859 A.2d 580 (2004); and could have brought the matter to the attention of the trial court. See *JPMorgan Chase Bank, N.A.* v. *Georgitseas*, 149 Conn. App. 796, 798, 89 A.3d 992 (2014) ("[w]e have repeatedly indicated our disfavor with the failure, whether because of mistake of law, inattention or design, to object to errors occurring the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment of such errors as grounds of appeal" [internal quotation marks omitted]); cf. *In re Leilah W.*, 166 Conn. App. 48, 53, A.3d      (2016) (after close of evidence assistant attorney general informed court it omitted canvass of respondent; court asked parties to return to court and canvassed respondent prior to issuing its decision).

[20] *In re Daniel N.*, supra, 163 Conn. App. 322, is further distinguishable from the present case because the issues claimed on appeal are different and this court decided the cases on different legal theories. *In re Daniel N.* was decided on the basis of retroactivity and also our Supreme Court's supervisory authority. The respondent in *In re Daniel N.*, did not seek reversal pursuant to the plain error doctrine and therefore this court performed no analysis of the harm caused by the failure to give the *Yasiel* canvass. In the present case, the respondent claims that the judgment terminating her parental rights in the child should be reversed pursuant to the plain error doctrine, which requires us to perform a harm analysis.

The present case is not the first time this court has considered a claim of plain error with respect to the *Yasiel* canvass. See *In re Raymond B.*, 166 Conn. App. 856,      A.3d      (2016). In that case, the respondent claimed that the termination of her parental rights should be reversed because the trial court failed to conduct the canvass "at the very start of the termination trial." (Internal quotation marks omitted.) Id., 865. Rather, trial commenced without the court canvassing the respondent, but on the second day of trial before the commissioner rested her case, the court, *Hon. Francis J. Foley III*, judge trial referee, sua sponte canvassed the respondent. Id., 860. The respondent acknowledged that she understood her rights, did not object to the timing of the canvass or file a posttrial motion for a mistrial or to open the evidence or seek any additional relief. Id., 861. In resolving the claim of the respondent in *In re Raymond B.*, the court looked to the recent decision of *In re Leilah W.*, 166 Conn. App. 48,      A.3d      (2016), for guidance.

In *In re Leilah W.*, this court concluded "that canvassing a respondent at the conclusion of the termination of parental rights trial was harmless error. In doing so, this court addressed the contours of what constitutes compliance with the canvass rule: Although this was not the procedure envisioned by our Supreme Court, and, accordingly should be avoided, if any concerns arose regarding the respondent's understanding of his trial rights, the trial court could have reopened the evidence to allow for additional proceedings if necessary. . . . This court also stated that *the burden is on the respondent to show the harm of a noncompliant canvass*." (Citation omitted; emphasis added; internal quotation marks omitted.) *In re Raymond B.*, supra, 166 Conn. App. 867.

In applying the second prong of the plain error doctrine to the facts of *In re Raymond B.*, this court concluded that failing to conduct the *Yasiel* canvass prior to the commencement of trial was not "so significant as to effect the fairness and integrity of the public confidence in the judicial proceedings" to require reversal. (Internal quotation marks omitted.) Id., 868. In the present circumstance, we have performed a harm analysis pursuant to the plain error doctrine, and therefore, this case is further distinguishable from *In re Daniel N.*

[21] We note that the question of whether the supervisory rule announced in *In re Yasiel R.* should be applied to other, then pending cases was before our Supreme Court in *In re Egypt E.*, SC 19643 and SC 19644. The court, however, declined to answer that question, and thereby declined to provide guidance for other pending appeals, when it remanded that case to the trial court. See *In re Egypt E.*, 322 Conn. 231, 233 n.1,      A.3d      (2016).

[22] "On the basis of our review of the trial court's canvass, we conclude that the court reasonably could have concluded that the respondent fully understood the trial process, the rights he had during the trial, and the potential consequences of the termination of his parental rights. The stated purpose underlying our Supreme Court's supervisory rule appears to have been effectuated in the present case. The respondent has failed to demonstrate that he was harmed by the trial court's failure to canvass him prior to the start of trial, and we do not believe that it is necessary to reverse the judgment simply to emphasize the importance of compliance with our Supreme Court's holding in *In re Yasiel R.*" *In re Leilah W.*, supra, 166 Conn. App. 65–66.

"[T]he respondent argues only that the time of the *In re Yasiel R.* canvass after the end of trial, but prior to the court deciding the case, amounts to structural error, and, thus, if the canvass is not conducted prior to the start of trial, a new trial always is required. This contention, however, expressly was rejected by this court in *In re Leilah W.*" *In re Elijah G.-R.*, supra, 167 Conn. App. 18.

[23] In the recent case of *State* v. *Gould*, 322 Conn. 519, 534–35,     A.3d (2016), our Supreme Court reasoned that the "defendant's argument that the improper exclusion of a prospective juror even without a showing of prejudice to avoid undermining public confidence in the fairness and integrity of our judicial system, is effectively an argument for structural error. See *Arizona* v. *Fulminante*, 499 U.S. 279, 309–10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). We have observed, however that there is a very limited class of cases involving error that is structural, that is to say, error that transcends the criminal process. *Johnson* v. *United States*, 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997)." (Internal quotation marks omitted.) "Structural errors have not been recognized outside the realm of constitutional violations except in extraordinary circumstances. See, e.g., *Nguyen* v. *United States*, 539 U.S. 69, 79–83, 123 S. Ct. 2130, 156 L. Ed. 2d 64 (2003) (structural error when appeals panel was improperly constituted in violation of statutory requirement and thus did not have authority to decide appeal)." *State* v. *Gould*, supra, 535.