******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE ANNABELLA S.*
## (AC 48919)

Moll, Suarez and Wilson, Js.

*Syllabus*

The respondent mother appealed from the trial court's judgment terminating her parental rights with respect to her minor child. The mother claimed that the court's failure to canvass her in accordance with *In re Yasiel R.* (317 Conn. 773) required reversal of the judgment pursuant to the plain error doctrine. *Held*:

This court determined that reversal was not warranted under the plain error doctrine, as the respondent mother failed to demonstrate that the trial court's error in failing to canvass the mother in accordance with *In re Yasiel R.* resulted in fundamental unfairness or manifest injustice.

Argued November 20, 2025—officially released January 22, 2026**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Tolland, Juvenile Matters, and tried to the court, *M. Murphy, J.*; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed*.

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent mother).

*Nisa Khan*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and

---

*In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

**January 22, 2026, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Angela Fierro*, assistant attorney general, for the appellee (petitioner).

*Opinion*

PER CURIAM. The respondent mother, Megan S., appeals from the judgment of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights with respect to her minor child, Annabella S. (Annabella).[1] On appeal, the respondent claims that the court's failure to canvass her in accordance with *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015), requires reversal pursuant to the plain error doctrine. We disagree and, therefore, affirm the judgment of the trial court.

The record provides the following relevant facts, which are uncontested or were found by the trial court, and procedural history. In June, 2023, Annabella was born at thirty-seven weeks gestation in an ambulance en route to Hartford Hospital. After her arrival at the hospital, Annabella tested positive for cocaine. The respondent reported to hospital staff that she used crack cocaine a few hours before giving birth to Annabella.[2] The respondent had previously transferred guardianship of her eldest child to the respondent's mother, the child's maternal grandmother, and her parental rights to her two other

---

[1] In the same proceeding, the court also adjudicated the petitioner's petition to terminate the parental rights of Annabella's biological father, Zachary S. The court rendered judgment terminating his parental rights, and he has not appealed from that judgment. Therefore, throughout this opinion, we refer to Megan S. as the respondent. When necessary to refer to Zachary S., we do so by referring to him as the biological father.

[2] Following Annabella's delivery, a drug screening revealed that the respondent tested positive for cocaine, fentanyl, and marijuana. The record reflects that the respondent had previously tested positive for marijuana on November 29, 2022, and positive for fentanyl, cocaine, and marijuana on May 9, 2023, approximately one month before Annabella's birth.

children were terminated in 2018 pursuant to petitions by the petitioner.

Following the birth of Annabella, on June 23, 2023, the Department of Children and Families (DCF) invoked a ninety-six hour hold due to "the parents' mental health and substance misuse issues." On June 26, 2023, the petitioner filed a petition of alleged neglect and a motion for an order of temporary custody on behalf of Annabella. On June 30, 2023, the court sustained the order of temporary custody and issued preliminary specific steps for the respondent to follow in order to regain custody of Annabella. On October 5, 2023, the respondent and the biological father entered pleas of nolo contendere to the allegations of neglect and Annabella was adjudicated neglected and committed to the care and custody of the petitioner. Final specific steps were ordered on October 5, 2023. Despite DCF's investigation into relative placements, Annabella was unable to be placed with any of her grandparents or her maternal great grandmother. The respondent and the biological father provided the name of a childhood friend as a possible placement for Annabella and subsequently agreed to the placement of Annabella with the childhood friend and her spouse (foster parents), who assumed care for Annabella upon her discharge from the hospital after her birth.[3]

On May 2, 2024, the court approved the first permanency plan of termination of parental rights and adoption, found that DCF had made reasonable efforts to reunify Annabella with the respondent and the biological father and found that the permanency plan was in Annabella's best interest. On July 18, 2024, the petitioner filed a petition to terminate the respondent's and the biological father's parental rights as to Annabella. The court summarized the grounds for the petition under General Statutes § 17a-112 (j) (3) as follows: "Ground

---

[3] Annabella has remained with her foster parents continuously since the time of her placement. In its memorandum of decision, the trial court found that the foster parents "meet [Annabella's] medical, educational, and emotional needs" and that Annabella "is bonded to her foster family . . . ."

**(A)** that the parents abandoned [Annabella] in the sense that the parents failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of [Annabella]; Ground **(B)(1)** that the parents failed to rehabilitate themselves to a degree that would encourage the belief that they could assume a responsible position in the life of [Annabella] within a reasonable time; and Ground **(E)** that the [respondent, the] mother of [Annabella], who is under the age of seven years and who has been adjudicated as neglected, failed to achieve such degree of personal rehabilitation as would encourage the belief that the [respondent] could assume a responsible position in the life of [Annabella] within a reasonable period of time considering the age and needs of [Annabella], and the [respondent] has two other children for whom her rights were previously terminated pursuant to [petitions] filed by [the petitioner]." On August 15, 2024, after the court confirmed service of the petition on the respondent and the biological father, both were advised of their rights[4] and entered pleas denying all allegations set forth in the petition.

On September 26, 2024, Zachary S. was adjudicated as Annabella's biological father based on genetic testing. A trial regarding the termination of parental rights as to both the respondent and the biological father commenced before the court, *M. Murphy, J.*, on January 29, 2025. Both the respondent and the biological father were represented by counsel during the proceedings. The petitioner submitted thirty-seven exhibits and

---

[4]The court advised the respondent and the biological father in relevant part: "[Y]ou have the right to remain silent. Anything you say can and will be used against you. You have the right to speak with an attorney before answering questions about your case. You have the right to have an attorney present while being questioned, and you have the right to stop answering questions any time you choose. . . . You have the right to deny allegations and to have a trial before the court. You have the right to confront the witnesses called against you, to call your own witnesses, to testify and to testify on your own behalf if you choose. If you choose not to testify, however, this court may draw an adverse interference from that choice not to testify." When asked if she understood her rights, the respondent replied, "[y]es."

presented testimony from two witnesses, a DCF social worker and a specialist with Multidimensional Family Recovery, both of whom had worked directly with the respondent. The respondent's counsel submitted two exhibits and, throughout the course of the proceedings, objected to various motions made by the petitioner and evidence offered by the petitioner. The respondent's counsel cross-examined the petitioner's witnesses, utilized the petitioner's exhibits during her cross-examination of the witnesses, and presented closing argument.

The respondent testified on her own behalf, and it is undisputed that the court failed to canvass the respondent regarding her rights prior to the start of trial in accordance with *In re Yasiel R.*, supra, 317 Conn. 773.[5] It is also undisputed that neither party brought the omission to the attention of the court. The respondent also did

[5] In *In re Yasiel R.*, our Supreme Court "conclude[d] . . . that it [was] proper to exercise [its] supervisory power . . . [to] require that, in all termination proceedings, the trial court must canvass the respondent prior to the start of the trial. The canvass need not be lengthy as long as the court is convinced that the respondent fully understands his or her rights. In the canvass, the respondent should be advised of: (1) the nature of the termination of parental rights proceeding and the legal effect thereof if a judgment is entered terminating parental rights; (2) the respondent's right to defend against the accusations; (3) the respondent's right to confront and cross-examine witnesses; (4) the respondent's right to object to the admission of exhibits; (5) the respondent's right to present evidence opposing the allegations; (6) the respondent's right to representation by counsel; (7) the respondent's right to testify on his or her own behalf; and (8) if the respondent does not intend to testify, he or she should also be advised that if requested by the petitioner, or the court is so inclined, the court may take an adverse inference from his or her failure to testify, and explain the significance of that inference. Finally, the respondent should be advised that if he or she does not present any witnesses on his or her behalf, object to exhibits, or cross-examine witnesses, the court will decide the matter based upon the evidence presented during trial. The court should then inquire whether the respondent understands his or her rights and whether there are any questions. This canvass will ensure that the respondent is fully aware of his or her rights at the commencement of the trial. It will neither materially delay the termination proceeding nor unduly burden the state." *In re Yasiel R.*, supra, 317 Conn. 795.

not file a motion seeking a mistrial or otherwise raise the present issue before the court prior to filing this appeal.

The court issued a memorandum of decision on May 15, 2025, granting the petitioner's petition to terminate the respondent's parental rights. The court found that the petitioner proved by clear and convincing evidence that termination of the respondent's parental rights was appropriate because the respondent had failed to rehabilitate pursuant to § 17a-112 (j) (3) (B) (i)[6] and (E).[7] The court, however, found that the petitioner failed to prove by clear and convincing evidence that the respondent had abandoned Annabella. In consideration of the court's findings and the factors set forth in § 17a-112 (k), including Annabella's age, the court determined that termination of the respondent's parental rights was in Annabella's best interest. Accordingly, the court terminated the parental rights of the respondent and appointed the petitioner as Annabella's statutory parent. This appeal followed.[8]

The respondent acknowledges that she did not preserve this claim before the trial court. On appeal, she asserts that the court's failure to canvass her as required by *In*

___

[6] General Statutes § 17a-112 (j) (3) (B) (i) provides for the termination of parental rights when "the child . . . has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[7] General Statutes § 17a-112 (j) (3) (E) provides for the termination of parental rights when "the parent of a child under the age of seven years who is neglected, abused or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ."

[8] Pursuant to Practice Book § 79a-6 (c), the attorney for Annabella filed a statement adopting the petitioner's brief in this appeal.

*re Yasiel R.*, supra, 317 Conn. 773, warrants reversal under the plain error doctrine. We disagree.

We begin our analysis with the well established legal framework for evaluating claims of plain error. "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . .

"First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernible on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the [respondent] simply to demonstrate that [her] position is correct. Rather, [to prevail] the party [claiming] plain error [reversal] must demonstrate that the claimed impropriety was so clear,

obvious and indisputable as to warrant the extraordinary remedy of reversal. . . .

"[A]lthough a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of the doctrine. Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Internal quotation marks omitted.) *In re Sydnei V.*, 168 Conn. App. 538, 562–64, 147 A.3d 147, cert. denied, 324 Conn. 903, 151 A.3d 1289 (2016). In considering the claim of plain error, we recognize that "[w]hether the trial court's failure to strictly comply with the rule announced in *In re Yasiel R.* warrants the granting of a new trial raises a mixed question of law and fact over which we exercise plenary review." *In re Leilah W.*, 166 Conn. App. 48, 60, 141 A.3d 1000 (2016).

The petitioner concedes, and we agree, that the respondent has satisfied the first prong of the plain error analysis—that the trial court erred by failing to conduct a canvass pursuant to *In re Yasiel R.* See footnote 5 of this opinion. Therefore, our inquiry is limited to whether the respondent has met her burden of demonstrating that the consequences of the trial court's error were so harmful that the failure to reverse the trial court's judgment will result in manifest injustice.

The respondent urges this court to conclude that, because our Supreme Court was motivated to implement a canvass for all termination proceedings by a belief that doing so would enhance "public confidence in the integrity of the judicial system," a trial court's failure to provide a canvass during a termination proceeding, regardless of the facts or circumstances of a case in which such failure occurred, constitutes reversible error. More

precisely, the respondent claims that the court's error alone serves as "satisf[action][of] the second prong of the plain error test as a matter of law because the error is so harmful that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) We are unpersuaded.

The respondent's assertion that the court's failure to canvass her at trial automatically satisfies the second part of the plain error test (and requires reversal) is tantamount to a claim of structural error. Structural error is "a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . ." (Internal quotation marks omitted.) *State* v. *Lopez*, 271 Conn. 724, 733, 859 A.2d 898 (2004). Under the structural error doctrine, "the error always results in fundamental unfairness." (Internal quotation marks omitted.) *State* v. *Simmons*, 188 Conn. App. 813, 837, 205 A.3d 569 (2019). This court in *In re Sydnei V.* rejected the appellant's argument that the mere fact that the trial court failed to provide a canvass in accordance with *In re Yasiel R.* satisfies the second prong of the plain error doctrine as a matter of law. See *In re Sydnei V.*, supra, 168 Conn. App. 564, 568. This court disagreed with the respondent's structural error argument and stated: "[M]erely demonstrating that a trial court has violated a supervisory mandate is not alone enough to warrant a reversal. The party raising the issue of noncompliance also must demonstrate actual harm." (Internal quotation marks omitted.) Id., 566; see also, e.g., *In re Elijah G.-R.*, 167 Conn. App. 1, 18, 142 A.3d 482 (2016) (This court rejected the respondent's claim that the failure to give a canvass prior to the commencement of a termination hearing in accordance with *In re Yasiel R.* was structural error, stating: "[T]he respondent argues only that the timing of the *In re Yasiel R.* canvass after the end of trial, but prior to the court deciding the case, amounts to structural error, and, thus, if the canvass is not conducted prior to the start of trial, a new trial always is required. This contention, however, expressly

was rejected by this court in [*In re Leilah W.*, supra, 166 Conn. App. 48].").

Although the respondent argues primarily that the failure to canvass her requires automatic reversal, she also attempts to demonstrate that she was "actually prejudiced" by the court's error and, therefore, meets her burden as to the second prong of the plain error analysis. In this regard, the respondent argues "that as a result of the trial court's failure to canvass her regarding her rights at trial and to ensure that she understood that she had a right to remain silent at trial, she was prejudiced because she testified under oath, and her testimony was manifestly harmful to her defense." She identifies two portions of her testimony in support of her claim of prejudice resulting from the court's failure to canvass her, the first regarding her engagement with an online therapy service, and the second regarding her substance misuse in October, 2024, approximately three months prior to trial.[9] The respondent argues that, because these two portions of her testimony were later used against her by the petitioner's counsel during closing arguments and were referred to by the court in its memorandum of decision, "[she] was prejudiced because she testified without fully understanding the significant consequences of testifying under oath, and her testimony was damaging

[9]The respondent testified regarding her engagement with an online therapy service. When asked about the number of therapists she had worked with since late 2023, the respondent replied, "[f]ive." The respondent was also unable to recall the name of her newest provider, with whom she had not yet met. The petitioner's counsel referenced this testimony in closing arguments as an indication of the respondent's failure to rehabilitate, arguing that the respondent had "cycled through five therapists from an online therapy website and to this day is not in treatment for any type of mental health counseling." The court also cited to this testimony in its memorandum of decision as evidence of the respondent's failure to rehabilitate. The respondent additionally testified that she had used illegal substances in October, 2024, three months before the termination of parental rights trial. During her closing argument, counsel for the petitioner cited this testimony as evidence of the respondent's failure to "[rehabilitate] from [her] significant substance misuse."

to her defense in several different respects." We are unpersuaded.

Although the respondent argues that she was "manifestly harm[ed]" by portions of her testimony, it appears that she benefited in part by her own testimony in light of the court's finding that the petitioner failed to prove by clear and convincing evidence the allegation that she had abandoned Annabella. Specifically, the court found that, "[w]hile . . . the parents did not visit [Annabella] as often as possible, [it could not] find that they did not maintain interest or concern for [Annabella]. The parents did maintain contact with [Annabella] after she was removed from their home. The court [found] that the parents provided gifts of clothing for [Annabella] and typically showed up to visits with food for her. The parents inquired about [Annabella's] well-being and attempted to keep a journal with the foster parents even if, in the long run, the mutual journal was unsuccessful. The court does not doubt that the respondent parents care about [Annabella] and love her."

Our review of the record also demonstrates that evidence regarding the respondent's inconsistent engagement with mental health services and her continued substance misuse did not come only from the respondent's testimony but was also established by the petitioner's exhibits and by the credited testimony of the petitioner's witnesses. In finding that the respondent had "failed to rehabilitate herself to the extent that she is able to assume a responsible position in the life of [Annabella] within the foreseeable future," the court cited multiple exhibits offered by the petitioner and credited witness testimony as evidentiary support for its factual findings. The respondent does not challenge the court's factual or legal findings on appeal.

Insofar as the respondent argues that she was prejudiced because she was not advised that she had a right to remain silent, we previously noted that, at the start of the respondent's plea hearing on August 15, 2024, on the termination of parental rights petition, she was

advised of her right to remain silent. See footnote 4 of this opinion. More importantly, the canvass mandated by *In re Yasiel R.* does not expressly include an advisement concerning a respondent's right to remain silent. See footnote 5 of this opinion. Instead, the canvass mandated by *In re Yasiel R.* includes an advisement that the respondent has the "right to testify on his or her own behalf" and "if the respondent does not intend to testify . . . the court may take an adverse inference from his or her failure to testify" and must "explain the significance of that inference." *In re Yasiel R.*, supra, 317 Conn. 795. Such a canvass was not provided at trial. At trial, the respondent chose to testify on her own behalf. Thus, the respondent's argument that she was manifestly harmed because the trial court failed to "ensure that she understood that she had a right to remain silent at trial" is not persuasive.

Finally, during oral argument before this court, the respondent's counsel was unable to point to a single right encompassed in the canvass mandated by *In re Yasiel R.* of which the respondent was deprived because of the trial court's failure to canvass her. This further supports the conclusion that the respondent is unable to demonstrate that a manifest injustice occurred in the trial proceeding. See, e.g., *In re Sydnei V.*, supra, 168 Conn. App. 567–68 (In concluding that reversal was not warranted, this court noted that, although the trial court did not canvass the respondent pursuant to *In re Yasiel R.*, the respondent "failed to explain what she did not know or understand about the termination of her parental rights without the court's canvass. She [did] not [explain] what she would have done differently if the court had canvassed her and how the outcome of the case would be different. In other words, the respondent . . . failed to explain how the court's failure to canvass her was harmful per se.").

For all of the foregoing reasons, we conclude that the respondent has failed to demonstrate that the trial court's error in failing to provide the canvass mandated by *In re Yasiel R.* resulted in fundamental unfairness

or manifest injustice. Accordingly, the respondent has failed to demonstrate that reversal of the judgment is warranted under the plain error doctrine.

The judgment is affirmed.